**NEW MEXICO ENVIRONMENTAL IMPROVEMENT DIVISION, Petitioner,**

v.

**Lee M. THOMAS, Administrator, United States Environmental Protection Agency, Respondent.**

**No. 85–1628.**

United States Court of Appeals, Tenth Circuit.

April 23, 1986.

Rehearing Denied May 22, 1986.

Louis W. Rose, Div. Atty., Sp. Asst. Atty. Gen. (Laure van Heijenoort, Sp. Asst. Atty. Gen., General Counsel, on brief) of Environmental Imp. Div., Santa Fe, N.M., for petitioner.

David W. Zugschwerdt (F. Henry Habicht, II, Asst. Atty. Gen., Margaret N. Strand, Michael W. Steinberg, U.S. Dept. of Justice, Mark Stanga, U.S.E.P.A., Washington, D.C.; Francis Blake, General Counsel, William F. Pedersen, Associate General Counsel, Peter H. Wyckoff, Asst. General Counsel, U.S.E.P.A., Region 6, Dallas, Tex., of counsel, with him on brief), for respondent.

Before BARRETT, MOORE and ANDERSON, Circuit Judges.

BARRETT, Circuit Judge.

This petition for review of a final rule promulgated by the Administrator of the Environmental Protection Agency (EPA) concerns disapproval of New Mexico's State Implementation Plan (SIP) under the Clean Air Act (CAA) and the resulting sanctions thereunder. The petitioner, Environmental Improvement Division (EID), is

a New Mexico state agency which operates the state's air quality program.

The CAA requires each state to submit a SIP for approval by the EPA. The SIP is to contain the state's plan for achieving the prescribed levels of certain air pollutants in the ambient air as determined under the National Ambient Air Quality Standards (NAAQS). In this case the offending pollutant is carbon monoxide (CO), which is found in automobile emissions. This case deals with the nonattainment of NAAQS for CO in the Albuquerque/Bernalillo County area. In this case, the required CO level has to be achieved by December 31, 1987. 42 U.S.C. § 7502(a)(2).

Under the CAA the state may divide its territory into air quality control regions (AQCRs) for purposes of measuring NAAQS. 42 U.S.C. § 7407(c). New Mexico partitioned the state into eight AQCRs; one of which was comprised of Bernalillo County, which includes Albuquerque, and sections of two surrounding counties. This AQCR was designated by the state as AQCR 2.

AQCR 2 was a nonattainment area for purposes of CO. In areas such as this where proper CO levels have not been achieved a vehicle emission control inspection and maintenance program (I/M program) must be submitted, approved, and implemented as part of the SIP. 42 U.S.C. § 7502(b)(11)(B). Here, a SIP, including an I/M program, was submitted by New Mexico and was approved by the EPA. The I/M program was operated by the City of Albuquerque and Bernalillo County (city/county) rather than the state. Under state law the city/county could assume authority for all air quality programs within AQCR 2 (N.M.Stat.Annot. § 74-2-4 (1978)) and the city/county had done so. The state statutes and the CAA provide, however, that the state is to assume primary responsibility for submitting a proper plan and assuring air quality within the entire state.

42 U.S.C. §§ 7407 and 7504 and N.M.Stat. Annot. § 74-2-4(B) (1978). The I/M program had operated for seventeen months when it was invalidated by the New Mexico Supreme Court on the grounds that it was in violation of state law. *Chapman v. Luna*, 678 P.2d 687 (1984).[1]

After the I/M program was invalidated, the EPA notified the Governor that New Mexico's SIP would be disapproved and sanctions might be imposed. Sanctions are mandatory under the CAA. The sanctions involved the discontinuation of certain federal funds for projects which exacerbated existing pollution problems. Several months later, in September, 1984, the EPA again notified New Mexico's Governor of its intended actions and issued a notice of proposed rule-making in the Federal Register. In its notice the EPA stated its reasons for disapproving the SIP, detailed possible sanctions, indicated how they could be imposed, and called for comments from interested parties on the proposed rule.

The EPA held several public meetings with various state and local officials. Several closed meetings were also held between EPA and federal, state, and local personnel. Much correspondence was exchanged. The city/county did not reimplement a revised I/M program. Instead, it passed a non-binding resolution asking the state legislature to fund an alternative vehicle testing program. On March 4, 1985, the EPA issued its final rule, disapproving the SIP, imposing sanctions, discussing its reasoning, and reviewing comments received.

The CAA allows sanctions to be imposed only in the nonattainment AQCR. The sanctions cut off CAA funds received directly by the city/county. (The city/county is not before the court on appeal.) The EPA also sanctioned a portion of the total CAA monies received by New Mexico equal

---

1. The *Chapman* decision held *inter-alia* that although Albuquerque was a home rule municipality it could not enact legislation which violated general state law. The court held that the I/M program violated a general state law which

forbade any county or municipality from requiring vehicle registration or charging fees for any vehicle subject to registration under New Mexico's Motor Vehicle Code.

to the percentage of the state's population which was living in AQCR 2. Although other sanctions were imposed, EID does not contest them.

On appeal EID raises these issues: 1) whether EPA's action limiting CAA funding assistance when an approved and operational SIP becomes inadequate is in excess of statutory authority and is arbitrary and capricious; and 2) whether the formula used by the EPA to calculate the portion of the total CAA monies to be withheld unlawfully penalizes and jeopardizes those air quality control regions that have attained the required CO levels.

## I.

The CAA authorizes judicial review of this type of agency action without designating the standard of review to be applied. 42 U.S.C. § 7607(b)(1) and (d). Therefore, we turn first to the Administrative Procedure Act (APA) for guidance. 5 U.S.C. § 706(2). Section 706(2) of the APA specifies several different standards of review; the appropriate standard depends upon the classification of the action to be reviewed.

The final EPA action here contains elements of both informal rulemaking and an adjudicatory type procedure, i.e., order. *See*, 5 U.S.C. § 551(4) and (6). The proceedings here involved a notice and comment period and hearings, effected a single entity, implicated both legislative and judicial functions of the agency, and resulted in the withholding of federal grant money.

■ To constitute an order under the APA, the CAA must provide that hearings be on the record after an opportunity for agency hearing. In CAA section 7506(a), the section involved in this action, there is no requirement that the agency provide an adjudicatory type proceeding when it intends to disapprove a SIP. Under the APA's definition, this is not an order.

■ However cases from this Court have not stopped with the APA definitions; instead, they have also looked at the character of a proceeding, to determine whether it is a rule or an order. *Anaconda*

*Company v. Ruckelshaus*, 482 F.2d 1301, 1306 (10th Cir.1973). Conflicting factual evidence often necessitates a trial-type agency hearing with the opportunity to confront witnesses and present evidence. Here the facts do not form the basis of the dispute between the parties. EID has contested only the legal conclusions that EPA has drawn from the facts. EID has been given an opportunity to present its views on the record and in this situation no more is required.

■ Even though elements of both informal rulemaking and an order are present, we hold, as have other courts which have considered the issue, that this is an informal rulemaking. *See, Appalachian Power Co. v. EPA*, 477 F.2d 495, 504 (4th Cir.1973) and *Delaware Citizens for Clean Air, Inc. v. EPA*, 480 F.2d 972, 976 (3d Cir.1973). As an informal rulemaking the appropriate standard of review is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Supreme Court has debunked the arbitrary and capricious standard in informal rulemaking:

[A] reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute.... The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, [419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447]; *Citi-*

zens to Preserve Overton Park v. Volpe, [401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136]. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Manufacturers Ass'n. v. State Farm Mutual, 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); accord, KVK Partnership v. Hodel, 759 F.2d 814, 816 (10th Cir.1985).

■ In applying the arbitrary and capricious test to the EPA's actions we will not substitute our judgment for that of the agency; instead, we will judge the agency's actions in light of the evidence before it and determine whether the agency's reasoning has been sufficiently adduced.

### II.1.

EPA imposed sanctions under 42 U.S.C. § 7506(a). Imposition of sanctions under this section is mandatory if certain conditions are not met. EID argues that section 7506(a) is inapplicable in this case and that EPA's use of that section is arbitrary and capricious. EID contends that the EPA should have proceeded under section 7506(b).

Sanctions shall be imposed under section 7506(a) if a SIP has not been submitted or if reasonable efforts toward submitting such a plan have not been made. Sanctions shall be imposed under section 7506(b) if the SIP or any of its requirements are not being implemented. The language of each section is mandatory; if the plan has not been submitted or is not being implemented, sanctions *shall* be imposed.

Section 7506(a) provides:

**Limitations on certain Federal assistance.**

**(a) Approval of projects or award of grants.**

The Administrator shall not approve any projects or award any grants authorized by this chapter and the Secretary of Transportation shall not approve any projects or award any grants under Title 23, other than for safety, mass transit, or transportation improvement projects related to air quality improvement or maintenance, in any air quality control region—

(1) in which any national primary ambient air quality standard has not been attained,

(2) where transportation control measures are necessary for the attainment of such standard, and

(3) where the Administrator finds after July 1, 1979, that the Governor has not submitted an implementation plan which considers each of the elements required by section 7502 of this title or that reasonable efforts toward submitting such an implementation plan are not being made (or, after July 1, 1982, in the case of an implementation plan revision required under section 7502 of this title to be submitted before July 1, 1982).

Section (b) provides:

**(b) Implementation of approved or promulgated plans.**

In any area in which the State or, as the case may be, the general purpose local government or governments or any regional agency designated by such general purpose local governments for such purpose, is not implementing any requirement of an approved or promulgated plan under section 7410 of this title, including any requirement for a revised implementation plan under this part, the Administrator shall not make any grants under this chapter.

The sanctions imposed by both sections are equivalent in all respects except one. The denial of Transportation funds is not authorized by section (b).[2] That, however,

**2.** Section (a) authorizes the sanction of CAA

monies (section 105 funds), denial of construc-

is not contested by EID. The sections sanction two different events. Section (a) punishes a failure to submit while section (b) punishes a lack of implementation. Problems with implementation are conceded by EID. (Petitioner's Brief at 6.)

 We fail to see how EID would have been in a different posture had EPA proceeded under 7506(b) because the formulas used to calculate the CAA sanctions are the same in this case, regardless of whether section (a) or (b) is used. (48 Fed.Reg. 35313 (Aug. 3, 1983) and 49 Fed. Reg. 34869 (Sept. 4, 1984).) Although the actual formula used by the EPA is found among EPA's policies and guidelines for section 7506(b) (48 Fed.Reg. 35313), EPA's policies and guidelines for section 7506(a) indicate no precise formula for calculating sanctions. They do, however, provide discretion to the agency in selecting the most appropriate method on a case-by-case basis. (45 Fed.Reg. 24692–96 (April 10, 1980).) In the Notice of Proposed Rulemaking EID was notified of the formula to be used. EID did not object to the use of that particular formula in this case and may not object now.

 Under the facts of this case, however, the EPA was authorized to proceed only under section 7506(a). The SIP's problems existed not with a difficulty in implementation; rather the plan contained legally inadequate elements from its inception. Under EPA's announced interpretation of the pertinent statutory section—an interpretation which the agency itself must abide by—a state is required to submit a legally enforceable plan, which must include elements for successful funding. *See, infra,* section II.2. Using EPA's interpretation of the statutory requirements, which are entitled to much deference, EPA had no choice but to proceed under section 7506(a). New Mexico failed to submit a plan which satisfied the requirements of 42 U.S.C. § 7410. In EPA's judgment, reasonable efforts had not been made to sub-

mit such a plan. Therefore, section 7506(a) had been violated. EPA's use of section 7506(a) to sanction petitioner was correct.

We must now determine whether the agency's decision—that New Mexico had violated section 7506(a)—is supported by the evidence. If it is not supported, its actions in this case—the rule imposing sanctions—will be deemed arbitrary and capricious.

### II.2.

EPA found that New Mexico had never submitted a SIP because the plan did not consider each of the elements required by section 7502 of the CAA. Specifically it did not contain the legal authority to implement or fund the I/M program. (50 Fed. Reg. 8616–20, March 4, 1985, col.1, (Sept. 4, 1984).) EPA also found that New Mexico had not made reasonable efforts toward submitting a SIP.

EID argues that an implementation plan had been submitted, was approved, and had been in operation for seventeen months. In the alternative, it argues, that even if EPA was justified in finding that such a plan was never "submitted," reasonable efforts had been made toward that end.

 In reviewing these findings, we are bound by a limited standard of review. *See infra,* section I. We may not substitute our judgment for that of the agency; nor may we deny the agency the powers that Congress delegated to it. Thus, if the agency's findings are reasonable they must be upheld.

 In examining an agency's interpretation of a statute that the agency is to administer, various considerations are taken into account. The court will defer to the agency's interpretation when an agency is charged with enforcing a statute, when such an interpretation is not contrary to clear statutory intent or the plain language of the statute, when the interpretation is contemporaneous with the legislation's en-

tion grants, withholding of Transportation funds, and denial of grants for enlargement of sewage treatment capacity. Section (b) autho-

rizes the same sanctions with the exception noted in the text. Only the denial of section 105 funds is contested by EID.

actment, and when such interpretation has been consistently adhered to by the agency over time. *See, American Mining Congress v. Thomas*, 772 F.2d 617, 626 (10th Cir.1985); and *Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1415–16 (10th Cir.1984).

The dispute centers on whether either of the two requirements of 7506(a)(3) (section three) have been satisfied. Under the first prong of the section three test, "if the Administrator finds ... that the Governor has not submitted an implementation plan which considers each of the elements required by section 7502 ..." then sanctions are to be imposed. After this amendment was added to the CAA in 1977, the EPA determined that it should provide some guidance to the states so they could determine when the SIPs that they submitted would be approved. To provide the states with direction, the EPA published the substantive criteria which SIPs had to contain and EPA's interpretation of the statute's requirement for a plan which *"considers each element...."* The document, published in the Federal Register, included the following:

> It is the intent of the Agency to establish reasonable and achievable goals for SIP submissions and to take a firm posture on the imposition of sanctions where the reasonable goals are not achieved.
>
> \* \* \* \* \* \*

[The explanation of the requirement that New Mexico's SIP did not satisfy was as follows:] Adoption in legally enforceable form [2] of all measures necessary to provide for attainment by the prescribed date.

---

[2] Written evidence that the State, the general purpose local government or governments, or a regional agency designated by general purpose local governments for such purpose, have adopted by statute, regulation, ordinance or other legally enforceable document, the necessary requirements and schedules and timetables for compliance, and are committed to implement and enforce the appropriate elements of the plan. The relevant organizations shall provide evidence that the legally enforceable attainment measures and the "criteria, standards and implementing procedures necessary

for effectively guiding and controlling major decisions as to where growth shall and shall not take place," prepared by State and local governments in compliance with Section 701 of the Housing Act of 1954, as amended, are fully coordinated in the attainment and maintenance of the NAAQS.

43 Fed.Reg. 21673–75 (May 19, 1978).

The statute also requires, as a distinct element of a SIP, that "the state will have adequate ... funding and authority to carry out such implementation plan ..."[.] 42 U.S.C. § 7410(a)(2)(F)(i). In further explanation of this requirement the EPA announced:

> An inspection/maintenance program or a schedule endorsed by and committed to by the Governor for the development, adoption, and implementation of such a program as expeditiously as practicable. Where the necessary legal authority does not currently exist, it must be obtained by June 30, 1979. Limited exceptions to the requirement to obtain legal authority by June 30, 1979 may be possible if the state can demonstrate that (a) there was insufficient opportunity to conduct necessary technical analyses and/or (b) the legislature has had no opportunity to consider any necessary enabling legislation for inspection/maintenance between enactment of the 1977 Amendments to the Act and June 30, 1979. [W]here a legislature has adequate opportunity to adopt enabling legislation before January 1, 1979, the Regional Administrator should require submission of such legal authority by January 1, 1979. In no case can the schedule submitted provide for obtaining legal authority later than July 1, 1980.
>
> \* \* \* \* \* \*
>
> A commitment to use insofar as is necessary Federal grants, state or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds, for the purpose of establishing, expanding or improving public transportation measures to meet basic transportation needs.

43 Fed.Reg. 21675–76 (May 19, 1978).

All of the criteria which must be satisfied in examining an agency's interpretation of

a statute have been met here. Congress made a strong commitment to lessening the nation's air pollution within a strict time frame. 42 U.S.C. §§ 7401 and 7502(c). Interpreting "considers" as "satisfies" furthers that end. EPA announced this interpretation shortly after the 1977 amendments were enacted, and EPA has adhered thereto during the past eight years. Its interpretation of the funding and authority requirement is also reasonable.

■■■ We hold, therefore, that the EPA's finding, that New Mexico had failed to submit a SIP which considered the requirement for an I/M program in AQCR 2 was reasonable because the SIP did not provide for the financial resources or legal authority necessary to implement the plan. There was ample support for EPA's decision in this case.

■■■ It is true that New Mexico did submit a plan which had been approved by the EPA prior to its invalidation by the New Mexico Supreme Court. However, mere submission of a plan is not enough. The plan submitted must also consider (i.e., satisfy) all requirements of section 7502. The I/M program contained its infirmity from its inception. Thus, EPA reasonably concluded that a satisfactory SIP in terms of section 7502 requirements had never been submitted. When the approved SIP contains an element that is invalidated by virtue of state law, adoption by the EPA is also invalidated. The status is as if the state had not submitted a SIP. Employing this type of fiction—that a valid SIP was *never* submitted—enjoys precedential support. *See, e.g., Sierra Club v. Indiana-Kentucky Electric Corp.*, 716 F.2d 1145, 1148 (7th Cir.1983). Although this does make SIPs vulnerable to state law challenges, impetus to avoid this pitfall via thorough research by the state is provided by the imposition of sanctions.[3] "[T]he State has an affirmative duty to investigate and compile data on the required elements, analyze that data, and consider and incorporate the required elements into the SIP in a manner consistent with the intent and purpose of the Act." (50 Fed.Reg. 8618, col.1 (March 4, 1985).)

### II.3.

Section three of 7506(a) is drafted in the disjunctive. Accordingly, if the Administrator finds that either such a plan was not submitted *or* that reasonable efforts were not being made, sanctions must be imposed. The statute does not require that the Administrator find that a state has failed *both* to submit a plan and to make reasonable efforts.[4] In effect, if the EPA has correctly found that a state has failed one of the two tests it must act. Here the EPA found that New Mexico failed both tests.

■■■ Our review of the record leads to the conclusion that the EPA's finding that the state had not made reasonable efforts to submit such a plan was reasonable. The first responsibility for enacting an approved I/M program lays with the city/county. After the state court struck down portions of the I/M program the city/county repealed the entire program. The *Chapman* court, however, had indicated that the severability clause in the ordinance did not require invalidation of the total program. The city/county may have been authorized to appropriate from its own budget funds for the I/M program or perhaps it could have imposed a local tax to satisfy funding needs. (Petitioner's Brief at 8, R., Vol. V, doc. 3.9, and R., Vol. IVIX, doc. 2.) Instead, it passed nonbinding resolutions requesting support from the state legislature to reestablish the I/M

---

3. *Cf. State Implementation Plans Under the Clean Air Act: Continued Enforceability as Federal Law After State Court Invalidation on State Grounds,* 19 Valparaiso, U.Law Rev. 877 (1985) (argues that SIPs are federal as well as state law and should remain in effect until SIP revisions are enacted.)

4. The EPA's policy under section 7506(a), however, also requires it to examine whether reasonable efforts are being made if the EPA Administrator first finds that a plan does not adequately consider the required elements or where no plan is submitted. (45 Fed.Reg. 24695 (April 10, 1980).)

program. No formal steps were taken to clearly indicate that the city/county would reestablish the program. The EPA also conducted public hearings and workshops on the proposed actions and sent representatives to meet with EID and local governing bodies. At the time that the EPA issued its final rule, the state legislature had not acted to fund any I/M program. The record reflects little support for the I/M program by the state legislature.

■■■ These were the circumstances on which EPA based its decision. The fact that the state legislature did act [5] after the EPA's promulgation of its final rule is not in the record because it occurred afterwards. The EPA cannot be held to a standard which requires it to consider after the fact information. If the basis of the agency's action is sufficiently clear and explained by the record it will be upheld. *Anderson v. U.S. Department of Housing and Urban Development*, 701 F.2d 112, 115 (10th Cir.1983).

### III.

EID also argues that the EPA should have given EID an opportunity to revise the SIP rather than impose sanctions. This, EID argues, is contemplated by 42 U.S.C. § 7410(a)(2)(H)(ii). This section does refer to revisions but it does not indicate that such action must be taken in lieu of sanctions. Section 7506(a) contains no requirement that a section 110(a)(2)(H) notice—revision notice—must be issued before the Administrator may make findings as required under section 7506(a). Furthermore, nearly one year passed between EPA's first contact with EID apprising it of proposed actions and the promulgation of the final rule. EID was notified of EPA's proposal to disapprove the SIP and impose sanctions on March 29, 1984. (R., Vol. VIII, doc. 2.) The EPA published its proposed actions in the Federal Register on Sept. 4, 1984. EID was aware that EPA proposed to promulgate its final rule within the time frame specified in the proposed rule. Actual and constructive notice of

EPA's intentions clearly informed EID that it must work under some time pressure.

■■■ EID was aware that it had the responsibility to act if the city/county could not or did not act. Under federal and state laws the *state* shall have the primary responsibility for assuring compliance of the air quality within its borders. 42 U.S.C. § 7407(a) and N.M.Stat.Annot. 74-2-4 (1978). The EID cannot claim that it was unaware of its responsibilities; nor can it assert ignorance of its state's laws. Based on the record before us, EID cannot reasonably argue that a one-year period within which to act constitutes an inadequate time period for revisions to be made.

### IV.

EID challenges the formula used by the EPA to determine the amount of sanctions to be applied in this case. EPA used a population-based formula and EID argues that it should have only withheld the actual amount given to AQCR 2.

The sole guidance from section 7506(a) on determining how money must be sanctioned is that it provides that the Administrator of the EPA shall not approve various projects and grants in any AQCR where the section's conditions have not been met. Apparently the EPA makes certain grants to the state and the state then has the discretion to determine how the grant money will be apportioned between the various air quality control regions within the state. Because the statute provided no hard and fast rules the EPA announced various formulas that it would apply in determining how CAA grant money was to be cut in any case where such a situation arose.

Here there is no dispute that grant money received by the city/county directly from the EPA will be sanctioned. However, the city/county also receives some of the general grant money that is given to the state. EPA states that it has no way of knowing how much of this general money goes to AQCR 2 unless the state in-

---

5. Further funding of the I/M program is now the subject of a state-wide voter referendum.

forms the agency. (Respondent's Brief at 29.) EID argues that only money actually received by AQCR 2, regardless of its source, should be sanctioned.

The formula that was actually used by the EPA to determine the dollar amount of section 105 sanctions was as follows:

The EPA will add all CAA funds which would normally be awarded to all levels of government in the State, and would withhold from that a percentage which is equal to the percentage of the State population residing in the I/M urbanized area. Direct grants made to the local government agency responsible for I/M implementation will be affected first, with any remaining restrictions to be applied against State Section 105 funds.

(50 Fed.Reg. 8616 (March 4, 1985).) This is EPA's "preferred method." Various methods for determining the amount of section 105 funds to be sanctioned were announced by the EPA in the Federal Register on August 3, 1983. The method mentioned above was identified as the preferred method.

In its proposed rule EPA announced that it was contemplating use of its preferred method in New Mexico. (49 Fed.Reg. 34869 (Sept. 4, 1984).)[6] However, that decision was not final, for EPA further stated that, "EPA is requesting comments on the use of this method and the other methods proposed in the August 3, 1983, notice, as applied to the situation in Bernalillo county." *Id.* A citation to the August 3, 1983, Federal Register was included. The August 3 notice articulated the various methods and how they were to work.

EID acknowledges that "[t]he formula on its face may look perfectly reasonable." EID, however, complains that its application here results in illegal discrimination for it denies money to some AQCRs which are in compliance because the state does not distribute section 105 funds to AQCRs throughout the state based on a population ratio. Whatever formulas or methods the

state actually uses are not included in the record.

■ The EPA solicited comments on the very issue that EID now protests. Neither EID nor anyone else advanced any dissatisfaction to the EPA through comments and documents in the record. Under these circumstances, we hold that such issue has been waived. If EID wished that the EPA consider a different formula which required EPA to study other information, it had a responsibility to place such information in the record.

EID was obligated to make its record before the agency. It failed to do so. Thus, we decline to consider any inferences which EID urges upon us for the first time on appeal. *American Frozen Food Institute v. Train,* 539 F.2d 107, 134 (D.C.Cir. 1976). ("What the industry failed to present to the Administrator during rule-making procedures when specifically asked to comment cannot now be urged [as] a basis for invalidation [of the rule].") *See also, American Mining Congress v. Thomas,* 772 F.2d 617, 625–26 (10th Cir.1985). ("[T]he agency's action must be reviewed . . . on the evidence and proceedings before the agency at the time it acted.") *Wilson v. Hodel,* 758 F.2d 1369, 1373 (10th Cir. 1985). ("[A] reviewing court will not consider contentions which were not pressed upon the administrative agency.")

■ The policy behind such a rule, i.e., refusal to consider issues not presented to the agency, is sound, for we may not substitute our judgment for that of the agency on matters where the agency has not had an opportunity to make a factual record or apply its expertise. It is the function of the court to review agency action based on the record before the agency unless exceptional circumstances justify use of extra-record materials. *See, American Mining Congress, supra,* at 626–27. Here no record was made by EID on the point. We will not review information that EID failed

---

**6.** At the very least, EID is deemed to have constructive notice of EPA's proposed rulemaking after the notice appeared in the Fed.Reg. *Road-* *way v. U.S. Dept. of Agriculture,* 514 F.2d 809, 815 (D.C.Cir.1975). Sufficiency of notice is not raised by EID.

to include in the administrative record or present before the EPA. *See generally, United States v. Tucker Truck Lines*, 344 U.S. 33, 34–35, 73 S.Ct. 67, 68, 97 L.Ed. 54 (1952).

The court will not entertain arguments which should have properly been made before the agency in the first instance. There have been no exceptional circumstances cited to the court by EID which would justify reopening the record. EID was obligated to register its complaints with EPA and attempt to convince the agency that its proposed actions were improper. EID failed to make the record and it is estopped from raising the issue here.

We grant enforcement of the final EPA rule challenged by this petition for review.