**INTERNATIONAL SNOWMOBILE MANUFACTURERS ASSOCIATION; Blue Ribbon Coalition, Inc; Wyoming State Snowmobile Association; Edward Dougherty David McCray; Jamie McCray; and Craig Koll, Plaintiffs,**

**State of Wyoming, State of Montana, and International Leisure Hosts d/b/a Flagg Ranch, Plaintiff–Intervenors,**

v.

**Gale NORTON, Secretary of the Department of Interior; Joseph Dodderidege, Acting Assistant Secretary for Fish, Wildlife and Park; Dennis Galvin, Acting Director U.S. National Park Service; Karen Wade, Regional Director Intermountain Region National**

Park Service; Michael Finley, Superintendent Yellowstone National Park; Jack Neckels, Superintendent John D. Rockefeller Memorial Parkway and Grand Teton National Park, Defendants,

Greater Yellowstone Coalition; National Parks Conservation Association; the Wilderness Society; and Natural Defense Council, Defendant–Intervenors.

No. 00–CV–229–B.

United States District Court,
D. Wyoming.

Oct. 14, 2004.

Brandon Lee Jensen, Budd–Falen Law Offices, Cheyenne, Gretchen L. Gaston, William P. Horn, Birch Horton Bittner and Cherot, Washington, DC, for Plaintiffs.

Jay Jerde, Wyoming Attorney General, Water & Natural Resources Division, Cheyenne, WY, for Plaintiff–Intervenor State of Wyoming.

Gay Woodhouse, Gay Woodhouse Law Office, Keith Burron, Associated Legal Group, Cheyenne, WY, for Plaintiff–Intervenor State of Montana.

James R. Walker, Rothgerber Johnson & Lyons, Denver, CO, for Plaintiff–Intervenor International Leisure Hosts Ltd, a Wyoming corporation dba Flagg Ranch.

Andrew C. Emrich, Department of Justice, Environment & Natural Resources Division, Washington, DC, Thomas D. Roberts, U.S. Attorney's Office, Cheyenne, WY, for Defendants.

Abigail M. Dillen, Earthjustice Legal Defense, Bozeman, MT, for Defendant–Intervenors.

## ORDER

BRIMMER, District Judge.

The case is before the Court on Plaintiffs and Plaintiff–Intervenors' Petitions for Review of Agency Decision. After considering the administrative record in this case, reading the briefs, hearing oral argument, and being fully advised in the premises, the Court **FINDS** and **ORDERS** as follows:

### Statement of Parties and Jurisdiction

Plaintiff International Snowmobile Manufacturers Association ("ISMA") is an organization of snowmobile manufacturers established in 1995. Plaintiff Blue Ribbon Coalition, Inc., is an Idaho non-profit organization representing over 1,055 businesses and organizations with approximately 600,000 members nationwide. Plaintiff Wyoming State Snowmobile Association ("WSSA") was established 30 years ago and is based in Jackson, Wyoming. WSSA has approximately 20 member clubs with approximately 2,000 individual members. Plaintiffs David and Jamie McCray are long-time residents of West Yellowstone, Montana, and have guided tours and rentals available for viewing Yellowstone. Plaintiff Craig Kroll has been a resident of Jackson, Wyoming, for fourteen years and owns Old Faithful Tours ("Old Faithful"), a small business located in Jackson, Wyoming. These Plaintiffs are collectively referred to as "ISMA Plaintiffs."

Plaintiff–Intervenor State of Wyoming ("Wyoming") intervened in this matter based on socioeconomic and state sovereignty concerns. The State of Montana ("Montana") intervened as a Plaintiff in this case based on socioeconomic and other interests. International Leisure Hosts d/b/a Flagg Ranch ("Flagg Ranch") intervened in this matter based on economic and other interests. The parties are col-

lectively referred to as "Plaintiff–Intervenors."

Defendant Gale Norton is sued in her official capacity as Secretary of the Department of the Interior; Defendant Joseph Dodderidge is sued in his official capacity as Acting Assistant Secretary for Fish, Wildlife and Park; Defendant Dennis Galvin is sued in his official capacity as Acting Director, U.S. National Park Service; Defendant Karen Wade is sued in her official capacity as Regional Director, Intermountain Region National Park Service; Defendant Michael Finley is sued in his official capacity as Superintendent, Yellowstone National Park; Defendant Jack Neckels is sued in his official capacity as Superintendent, John D. Rockefeller Memorial Parkway and Grand Teton National Park. These Defendants will be collectively referred to as "Federal Defendants."

The Greater Yellowstone Coalition ("GYC"), National Parks Conservation Association, The Wilderness Society, Blue Water Networks, and Natural Resources Defense Council (collectively referred to as "GYC") intervened in this matter as Defendants pursuant to this Court's Order Granting Motion to Intervene filed February 9, 2001. The GYC is a conservation group dedicated to protecting the Greater Yellowstone ecosystem and has submitted briefs on behalf of the other four Defendant–Intervenors. Blue Water Networks withdrew from participation in this case pursuant to this Court's Order to Withdraw filed January 22, 2004.

The Court exercises federal question jurisdiction. 28 U.S.C. § 1331. Venue is proper. 28 U.S.C. § 1391(b),(e).

### Background

Congress established Yellowstone as the Nation's first national park. 16 U.S.C. § 21. In 1882, Congress set aside two million acres "as a public park or pleasuring-ground for the benefit and enjoyment of the people." 16 U.S.C. § 21. Then in 1916, Congress established the National Park Service ("NPS") to:

Promote and regulate the use of the Federal areas known as national parks ... as provided by law, by such means and measures as conform to the fundamental purpose of the said parks ... which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.

Until 1955, snowplanes were the only oversnow machines used in Yellowstone and Grand Teton National Parks. A.R. 28412. In 1955, the NPS launched a program to ease the pressure of summer use and distribute visitors throughout the year. A.R. 28412. The first snowmobiles entered the Park in 1963. A.R. 28412. From 1963 to 1966, the number of snowmobiles in the Parks increased from 1,000 to 5,000. A.R. 28412. In 1968, the NPS developed the first formal winter use policy. A.R. 28415. That policy encouraged and permitted winter use by snowmobiles. A.R. 28415. In 1971, the NPS began grooming snow roads. A.R. 28415. Winter use in the Park has continually increased from that time. During the winter of 1996–97, a large number of bison left the Park. A.R. 28416. Some, but not all, of these bison left on groomed trails. A.R. 28416. Over 1,000 of the bison leaving the Parks were killed in order to protect livestock from the transmission of brucellosis. A.R. 28416.

Those events led to a 1997 lawsuit brought by the Fund for Animals against the NPS alleging that Yellowstone's winter use plan violated the National Environmental Policy Act ("NEPA") and the En-

dangered Species Act ("ESA"), which ultimately led to this litigation. A settlement agreement was reached in 1997 in which the NPS agreed to prepare an Environmental Impact Statement ("EIS") addressing the issues of snowmobile use and trail grooming in Yellowstone. As a result of that litigation the NPS released a Draft EIS ("DEIS") on winter use in the Yellowstone National Park, Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway (collectively referred to as "Yellowstone" or the "Parks"). The DEIS was released on September 29, 1999. A.R. 19125. The DEIS contained seven alternatives. Alternative A continued the existing historic winter use program with no restrictions on snowmobile access. A.R. 19133. Alternative B, the NPS's preferred alternative, allowed continued use of snowmobiles, subject to new standards to reduce emissions and noise. A.R. 19133. Alternatives C through F allowed continued use of snowmobiles with various standards for reducing emissions and noise. A.R. 19134. Alternative G emphasized the use of clean and quiet oversnow access to the parks using the technologies available today. A.R. 19134.

In late January 2000, the NPS prepared a revised version of Alternative G, which created snowcoach only access to the Parks, discontinued all motorized use on Jackson Lake and provided for additional road closures.

In October 2000, the NPS published the FEIS for winter use in Yellowstone. The Final EIS ("FEIS") was published in its entirety on the NPS website on October 10, 2000; however, notice of the availability of the FEIS was not published in the Federal Register until October 31, 2000. *See* Notice, Winter Use Plans, FEIS, 65 Fed.Reg. 64986 (October 31, 2000). The FEIS made Alternative G the preferred alternative; this alternative called for a ban on snowmobiles in the Park and re-

placed snowmobile use exclusively with NPS operated snowcoaches. After the publication of the FEIS, the public was given until October 31, 2000, to comment. Then, on November 22, 2000, the NPS issued its Record of Decision ("2000 ROD"), adopting the FEIS preferred alternative, which would have eliminated snowmobile use in the Parks beginning in the 2002–2003 season and cutting snowmobile use by 50 percent in the 2001–2002 season. *See* Record of Decision, Winter Use Plans, 65 Fed.Reg. 80,908 (November 22, 2000).

On December 18, 2000, the NPS published the Proposed Rule for implementing a ban on snowmobile use in the Parks. *See* Proposed Rule, 65 Fed.Reg. 79024–34 (December 18, 2000). The period for public comment was open until January 17, 2001. Then, on January 18, 2001, the last day of the Clinton Administration, the final rule ("2001 Snowcoach Rule") was issued, implementing the provisions of the 2000 ROD. *See* Snowcoach Rule, 66 Fed.Reg. 7260, 7268 (January 22, 2001).

On December 6, 2000, ISMA, along with other interested parties, filed suit in this Court challenging the 2000 FEIS, 2000 ROD, and, ultimately, the 2001 Snowcoach Rule. The State of Wyoming intervened as a plaintiff in the action, based on its interest in protecting the citizens of Wyoming. The Greater Yellowstone Coalition, National Parks Conservation Association, The Wilderness Society, Blue Water Networks, and Natural Resources Defense Council intervened as defendants to this action.

In June 2001, ISMA, Wyoming and the Federal Defendants entered into a Settlement Agreement ("2001 Settlement Agreement"). The NPS agreed to prepare a supplemental EIS, taking into consideration new snowmobile technologies not included in the 2000 FEIS. At the request of the parties, this Court stayed the litigation

pending completion of the supplemental EIS process.

In November 2002, the NPS issued a rule postponing the implementation of the 2001 Snowcoach Rule until the NPS completed the supplemental EIS (the "2002 Rule"). *See* Final Rule, 67 Fed.Reg. 69,-473 (November 18, 2002). The 2002 Rule allowed unlimited snowmobile access for the 2002–2003 snowmobile season, but provided limited daily entries of snowmobiles during the 2003–2004 season of 493 snowmobile entries per day in Yellowstone and a total of 543 snowmobiles entries per day in the Parks.

The NPS evaluated new research showing dramatic decreases in snowmobile emissions offered by new 4–stroke snowmobiles. These new 4–stroke snowmobiles offer decreased hydrocarbon levels of more than 90 percent, reduced carbon emissions of more than 70 percent and decreased sound levels of approximately 50 percent. After considering these new technologies, the NPS issued a 2003 FEIS adopting a new alternative which would allow continued snowmobile access to the Parks, subject to certain limitations on emissions reductions and daily entries. The NPS published the Record of Decision ("2003 ROD") adopting this alternative in March 2003.

On December 11, 2003, the NPS issued its final rule ("2003 Final Rule") allowing 950 snowmobiles a day in Yellowstone and a total of 1,140 snowmobiles a day in the Parks. *See* Final Rule, 68 Fed.Reg. 238 (December 11, 2003). The 2003 Final Rule required four stroke engines on eighty percent of the snowmobiles entering the Parks.

Before the NPS completed the 2003 FEIS, the Fund for Animals and the Greater Yellowstone Coalition had filed two lawsuits challenging the 2003 Further Delay Rule, the 2003 FEIS, the March 2003 ROD and the 2003 Final Rule in the United States District Court for the District of Columbia ("D.C. District Court"). ISMA and Wyoming intervened in these actions. Both ISMA and the NPS filed motions to transfer the case from the D.C. District Court to the Wyoming District Court because of the potential overlap in the issues between the case currently pending in United States District Court for the District of Wyoming ("Wyoming District Court") and the cases before the D.C. District Court. The D.C. District Court consolidated the two cases, but denied the motions to transfer, finding that:

> [T]he issues presented in this case are different from those raised by the case still pending before the U.S. District Court for the District of Wyoming. Different agency documents and decisions are being challenged in each case, each of which must be reviewed with reference to its particular administrative record. The Wyoming case involves a challenge to the 2000 EIS, the November 2000 ROD, and the January 2001 final implementing regulations. These documents, and their attendant administrative records, are entirely distinct from those challenged in these actions, which are the November 20, 2003 "Further Delay Rule," the 2003 SEIS, and the March 2003 ROD, each of which was based on a discrete administrative record.

(Order of September 15, 2003 at p. 9, Judge Sullivan).

After a hearing on November 20, 2003, and another on December 15, 2003, the D.C. District Court issued a Judgment and Memorandum Opinion on December 16, 2003, only four days after the publication of the 2003 Final Rule, vacating the March 2003 Supplemental EIS, the 2003 ROD and the 2003 Final Rule. The D.C. District Court remanded the March 2003 Supplemental EIS, the 2003 ROD and the De-

cember 11, 2003, Final Rule to the NPS for further proceedings and ordered the 2001 Snowcoach Rule, as modified by the 2002 Rule to remain in effect until further order of the Court.[1]

Wyoming and ISMA requested a stay of the D.C. District Court decision in the D.C. District Court, then in the D.C. Circuit Court of Appeals. Both of these requests were denied.

Because of the D.C. District Court ruling, the 2001 Snowcoach Rule was implemented for the first time on December 16, 2003. Once the 2001 Snowcoach Rule was in effect for the first time, Wyoming requested that this Court reopen the pending case challenging the validity of the 2001 Snowcoach Rule. The case was reopened by this Court's Order Reopening Case filed December 31, 2003.

This Court granted a Temporary Restraining Order, prohibiting the continued implementation of the 2001 Snowcoach Rule on February 10, 2004. The Court denied Defendant Intervenors' Motion to Stay Case Pending Appeal on February 19, 2004. That decision was appealed to the Tenth Circuit Court of Appeals. The Tenth Circuit denied Defendant Intervenors' Motion to Stay and also found that this Court had jurisdiction to act on the 2001 Snowcoach Rule. *Int'l Snowmobile Mnfrs. Ass'n. v. Norton,* No 04–8010 (10th Cir. March 10, 2004).

### Standard of Review

Judicial review of an agency's final action is governed by the Administrative Procedure Act ("APA"). See 5 U.S.C. §§ 701 to 706; *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Under the APA, a federal court may set aside agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). An agency decision is arbitrary or capricious if: (1) the agency entirely failed to consider an important aspect of the issue; (2) the agency offered an explanation for its decision that was counter to the evidence before it; (3) the agency relied on factors that Congress did not intend for it to consider; or (4) the agency's decision is so implausible that it could not be ascribed to the product of agency expertise. *Colo. Envtl. Coalition v. Dombeck,* 185 F.3d 1162, 1167 (10th Cir.1999).

In applying this deferential standard of review, a federal court is required to review the whole administrative record, or those parts of the record cited by the parties. *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1164 (10th Cir.2002). The court reviews the administrative record to ensure the agency's decision was based on consideration of the relevant factors and was not the result of a clear error in judgment. *Colo. Envtl. Coalition,* 185 F.3d at 1167. In so reviewing, the court cannot substitute its judgment for that of the agency. *Utahns for Better Transp.,* 305 F.3d at 1164.

The essential function of judicial review under the APA is for the federal court to determine whether the agency: (1) acted within its scope of authority; (2) complied with prescribed procedures; and (3) acted in accordance with law (i.e., did not act arbitrarily or capriciously). *Olenhouse,* 42 F.3d at 1574. In the end, administrative decisions may only be set aside for substantial procedural or substantive reasons. *Utahns for Better Transp.,* 305 F.3d at 1164. However, courts and agencies alike should be mindful that an "agency's rulemaking power is not the power to make law, it is only the power to adopt regula-

---

**1.** The 2001 Snowcoach Rule provided a 50 percent reduction of snowmobiles for the 2001–2002 season and a complete ban in the 2002–2003 season. The 2002 Rule provided for implementing the phase-out and ban by one season.

tions to carry into effect the will of Congress as expressed by the statute." *Sundance Assocs. v. Reno,* 139 F.3d 804, 808 (10th Cir.1998) (internal quotation marks and citations omitted).

### Analysis

The parties have presented several issues in their briefs. The Court will first address GYC's contention that this matter is moot. Next, the Court will address Plaintiffs and Plaintiff Intervenors' claims that the 2000 FEIS, 2000 ROD and 2001 Snowcoach Rule were promulgated in violation of NEPA and APA. Finally, the Court will consider the appropriate relief.

### I. Mootness

 GYC argues that this Court no longer has jurisdiction because Petitioners' claims under NEPA and APA are moot. GYC asserts that the 2001 Snowcoach Rule is no longer in effect and there is no reasonable expectation that it will ever be implemented in the future. The Court disagrees with GYC's assertion. The 2001 Snowcoach Rule was implemented for the first time after the December 16, 2003, ruling from the D.C. District Court. Without a final determination on the validity of the 2001 Snowcoach Rule, the Court leaves open the possibility that any new rules and regulations implemented by the NPS could be found invalid and as a default, the potentially invalid 2001 Snowcoach Rule would be reimplemented, causing the same serious financial repercussions experienced when the 2001 Snowcoach Rule was implemented on December 16, 2003.

For these reasons the Court does not believe these issues are moot.

### II. Challenges to the 2000 Snowcoach Rule, 2000 ROD and 2001 FEIS.

Plaintiffs and Plaintiff–Intervenors argue that the 2001 Snowcoach Rule, the 2000 ROD and 2000 FEIS were promulgated in violation of NEPA and the APA. Plaintiff and Plaintiff–Intervenors make several claims for violations of NEPA and the APA.

### A. NEPA Overview.

Plaintiffs and Plaintiff Intervenors generally claim that the 2001 Snowcoach Rule was promulgated in violation of NEPA. Federal Defendants and Defendant–Intervenors claim that the NPS complied with all of the procedural requirements of NEPA.

### 1. NEPA's Statutory Mandate and Structure.

NEPA requires federal agencies to consider the environmental impacts of their actions, disclose those impacts to the public, and then explain how their actions will address those impacts. *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). NEPA prescribes the process, not the end result, of agency action. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). In this regard, the Tenth Circuit has repeatedly emphasized that NEPA only requires an agency to take a "hard look" at environmental consequences before taking a major federal action that significantly affects the quality of the human environment. *Citizens' Comm. to Save Our Canyons v. U.S. Forest Service,* 297 F.3d 1012, 1022 (10th Cir.2002) [hereinafter "Save Our Canyons"].

To ensure that federal agencies take a "hard look" at the environmental consequences of their actions, NEPA requires an agency to prepare an environmental impact statement ("EIS"). *Friends of the Bow v. Thompson,* 124 F.3d 1210, 1213 (10th Cir.1997). "An EIS is a detailed statement of the environmental impact of a

proposed action." *Id.* The Tenth Circuit has described the NEPA process an agency follows in preparing an EIS:

> Initially, any agency announces its intent to study a proposed action through a process called scoping, during which the agency solicits comments and input from the public and other state and federal agencies with the goal of identifying specific issues to be addressed and studied. 40 C.F.R. § 1501.7. After assessing the input from the scoping process, the government then prepares a draft Environmental Impact Statement (DEIS), Id. § 1502.9(a), which is then presented to the public and other government agencies for notice and comment. Id. § 1503.1(a). After evaluating the feedback received during the notice and comment process, the agency prepares a [final EIS (FEIS) ]. Id. § 1502.9(b). If after preparing either a DEIS or FEIS, the proposed action substantially changes in a way "relevant to environmental concerns," or if new information comes to light about environmental impacts, an agency must prepare a supplemental EIS (SEIS). Id. § 1502.9(c)(1).

*Save Our Canyons,* 297 F.3d at 1022.

In the end, the agency must address the following in its EIS: (1) the purpose and need for the proposed action; (2) environmental impacts resulting from the actions; (3) alternatives to the proposed action; (4) the relationship between short-term uses and long-term productivity; and (5) the amount of resources that must be devoted to the proposed action. *Id.;* 42 U.S.C. § 4332(2)(C)(i)-(v); 40 C.F.R. § 1502.10.

### 2. Judicial Review of NEPA Compliance.

The role of the judiciary in the NEPA process is twofold. First, the court must ensure that the agency has taken a hard look at the environmental consequences of its actions and has adequately disclosed those impacts to the public. *Baltimore Gas,* 462 U.S. at 97–98, 103 S.Ct. 2246; *Middle Rio Conservancy Dist. v. Norton,* 294 F.3d 1220, 1225 (10th Cir.2002). Second, the court must ensure that the agency's decisions were not arbitrary or capricious. *Baltimore Gas,* 462 U.S. at 97–98, 103 S.Ct. 2246; *Utahns for Better Transp.,* 305 F.3d at 1163.

■ In reviewing the adequacy of an EIS, a federal court simply examines whether the agency objectively presented all the topics required by NEPA. *Colo Envtl. Coalition,* 185 F.3d at 1172. In so reviewing, the court must make a pragmatic judgment about whether the preparation of the EIS and its ultimate form and content fostered informed public participation and informed decisionmaking. *Id.*

■ While a federal agency is entitled to a presumption of regularity in arriving at its decision, the court is not simply a "rubber stamp" for agency action and will set aside agency action if it is in contravention of the agency's own rules or congressional mandate. *See Glisson v. U.S. Forest Service,* 876 F.Supp. 1016, 1023–24 (S.D.Ill.1993). In other words, the court will not accept *pro forma* compliance with NEPA procedures, nor post hoc rationalizations as to why and how the agency complied with NEPA. *See Davis v. Mineta,* 302 F.3d 1104, 1112–13 (10th Cir.2002); *Utahns for Better Transp.,* 305 F.3d at 1165.

### 3. Plaintiffs and Plaintiff Intervenors Specific NEPA Claims.

Plaintiffs and Plaintiff–Intervenors argue the NPS violated NEPA in essentially three ways during the promulgation of the 2001 Snowcoach Rule. While ISMA, Wyoming, Montana and Flagg Ranch have all filed individual briefs in this case, the Court believes that all of these parties have stated essentially the same NEPA

violations. The main allegations of NEPA violations are: 1) the NPS failed to take a hard look at Alternative G; 2) the NPS improperly pre-judged the outcome; 3) the NPS failed to meet its obligations to the cooperating agencies; and 4) the NPS deprived the public of meaningful participation.

### a. The NPS Failed to Take a "Hard Look."

■ Plaintiffs and Plaintiff–Intervenors claim that the NPS adopted Alternative G without any assessment of snowcoach emissions or of the feasibility and safety of mandating total conversion to snowcoach only access. ISMA claims that the NPS only considered two sound studies including snowcoaches, and one emissions study. A.R. 4070–196 & 5642, 5656–81. GYC argues that there is no legitimate dispute that snowcoaches are quieter and less polluting than snowmobiles. Federal Defendants assert that the NPS took the requisite "hard look" at snowcoach use in the Parks.

NEPA " 'prescribes the necessary process' by which agencies must take a 'hard look at the environmental consequences of proposed actions utilizing public comment and the best available scientific information.' " *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1035 (10th Cir.2001).

In reviewing the adequacy of a FEIS the Tenth Circuit has stated that it will examine:

"Whether there is a reasonable, good faith, objective presentation of the topics [the National Environmental Policy Act] requires an [environmental impact statement] to cover." *Holy Cross*, 960 F.2d at 1522 (quotation marks and citation omitted). Our objective is not to "fly speck" the environmental impact statement, but rather, to make a "pragmatic judgment whether the [environmental impact statement]'s form, content and

preparation foster both informed decision-making and informed public participation." *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987) (quotation marks and citation omitted).

*Colo Envtl. Coalition*, 185 F.3d at 1172.

In considering the snowcoach only alternative, the NPS conducted a sound study which computed the effects of existing and future oversnow and road vehicle emissions on the natural sound scape in the Parks. A.R. 4073–4197. The NPS also conducted a literature review comparing emissions levels from snowmobiles with emissions of two snowcoaches. A.R. 742. But, no where was there a study of the small windows of snowcoaches usually fogged by passengers' exhalation, the cramped, uncomfortable seating, and the slowness of the coaches, all of which are to the detriment of Park visitors' enjoyment of their trip.

Under Alternative G, there would have been a substantial increase in the number of snowcoaches entering the Parks. Yet, the Administrative Record does not reveal any studies conducted on the impacts of additional snowcoaches. It does not appear to this Court that the NPS did any scientific study on the effects of emissions or noise of numerous snowcoaches entering the Parks.

### b. The NPS Improperly Pre–Judged the Outcome.

Plaintiffs and Plaintiff–Intervenors assert that the NPS made a prejudged political decision to ban snowmobiles in the Parks. Federal Defendants argue that the NPS's decision to change the preferred alternative was in response to public comments and indicates that the NEPA process worked as intended. GYC asserts that any predetermination on the NPS's

part is irrelevant if the EIS satisfies the requirements of NEPA.

The DEIS was released on September 29, 1999. A.R. 19125. The DEIS contained seven alternatives. A.R. 19133–34. Alternative A continued the existing historic winter use program of no restriction on snowmobile access. A.R. 19133. Alternative B, the NPS's preferred alternative, allowed continued use of snowmobiles, subject to new standards to reduce emissions and noise. A.R. 19133. Alternatives C through F allowed continued use of snowmobiles with various standards for reducing emissions and noise. A.R. 19133–34. Alternative G emphasized the use of clean and quiet oversnow access to the Parks using the technologies available today and contemplated the eventual phasing out of recreational snowmobiling. A.R. 19134.

ISMA claims that on April 27, 2000, before the FEIS or ROD were issued and the decision making process was complete, Assistant Secretary for Fish and Wildlife and Parks Donald Barry sent a memorandum to the Director of the NPS service directing the agency to prohibit snowmobile access in national park units. A.R. 25333–43. This memorandum provided a sweeping condemnation of all recreational snowmobile use in the National Park System. A.R. 25333–43. Also on April 27, 2000, Secretary Barry held a press conference in which he stated that "generally, there will be, no future for these antiquated polluting vehicles in the National Park System." A.R. 25326. He went on to state that "the Park Service welcome mat is being pulled in for snowmobiling as an acceptable form of winter recreation in our national parks." A.R. 25326. These gratuitous (but prejudicial) comments from Secretary Barry came seven months after the release of the DEIS and there is no indication on the record that any additional studies or information were gathered dur-ing that time to create such a dramatic change in the position of the NPS.

Federal Defendants argue that the change in the preferred alternative came as a result of comments received through the NEPA process. Approximately 46,500 comment letters were received during the comment period for the DEIS. A.R. 28461. Of those comments, forty-four percent supported revised Alternative E, which would have continued snowmobile use in the Park. A.R. 28465. Forty-five percent of the comments supported the Citizen's Solution, which included a ban on snowmobiles in the park and provided for the exclusive use of snowcoach access on current oversnow roads in Yellowstone. A.R. 28465. Additionally, Federal Defendants argue that comments made by Secretary Barry, specifically did not apply to Yellowstone and Grand Teton National Parks.

The Court agrees with the Federal Defendants that Secretary Barry specifically excluded Yellowstone and Grand Teton National Parks in his memorandum. Specifically, Secretary Barry stated "because the winter use planning effort for Yellowstone and Grand Teton National Parks and the John D. Rockefeller Jr. Memorial Parkway is nearly complete, snowmobile use in those units will be governed by the final administrative action selected in the Record of Decision." A.R. 25338. This Court finds it interesting that at the time of this memorandum Secretary Barry knew the NPS had changed its preferred alternative to Revised Alternative G; in fact, it appears that Secretary Barry made the initial decision to change the preferred alternative to Revised Alternative G. A.R. 23085 (Letter from three governors indicating that Alternative G was selected as the preferred alternative at Secretary Barry's direction.).

Additionally, in his speech on April 27, 2000, Secretary Barry referred to Yellow-

stone and Grand Teton National Parks on several occasions and also presented a tape recording of snowmobile use in Yellowstone National Park. Further, Secretary Barry stated:

Imagine yourself at Old Faithful in Yellowstone or at some other scenic wonder in a different national park. And imagine yourself trying to absorb the serenity and the meaning of the place with the taunting roar of snowmobiles bombarding your peace of mind. According to recent visitor use surveys, this is not the type of experience that visitors to our national parks want.

A.R. 25327–38.

The Court believes that these comments, which were made before the FEIS or ROD process was complete, indicate a prejudged political conclusion to ban snowmobiles from the Parks. Given these definite statements from the Assistant Secretary for Fish and Wildlife and Parks, it does not seem that the NPS could have issued any other rule than the one that was ultimately contained in the 2001 Snowcoach Rule. These statements clearly indicate that on April 27, 2004, prior to issuance of the FEIS or the ROD governing winter use in the Parks, the NPS had already reached a prejudged political conclusion. After that time, the issuance of the FEIS, ROD and Final Rule were nothing more than *pro forma* compliance with the requirements of NEPA.

**c. The NPS Failed to Meet Its Obligation to Cooperating Agencies.**

Plaintiffs and Plaintiff–Intervenors alleged that the NPS violated NEPA by failing to involve or consider the input from cooperating agencies. Generally, Montana and Wyoming claim that the NPS failed to consult with the cooperating agencies on the decision to change the preferred alternative to revised Alternative G, failed to allow adequate time for review and comment on the DEIS and ignored cooperating agency comments.

Wyoming and Montana contend that the NPS did not consult with the cooperating agencies before including Alternative G in the DEIS. Wyoming and Montana claim that the NPS worked closely with the cooperating agencies in developing Alternatives A through F, which were included in the DEIS. Wyoming and Montana assert that the NPS then unilaterally added Alternative G to the list of alternatives to be considered in the DEIS without any communication with the cooperating agencies.

The NPS provided cooperating agencies with the final list of alternatives to be included in the DEIS on April 20, 1999. The cooperating agencies were then given until May 24, 1999, to analyze and comment on the six proposed alternatives. Wyoming and Montana argue that they were not give adequate time to review and comment on the DEIS.

After the DEIS was issued and public comments were received, Wyoming and Montana claim that the NPS began unilaterally revising Alternative G in January 2000. A.R. 25440 (an email dated 1/28/2000 asking for a draft two-page statement on the rational for the new alternative). Cooperating agencies were notified of the proposed change for the first time during a meeting in March 2000, but were not given the draft Alternative G until April 20, 2000, after the NPS had decided to make revised Alternative G the preferred alternative.

In addition to allegations that the NPS excluded cooperating agencies through impossible deadlines, Wyoming and Montana both allege that the NPS disregarded cooperating agency expertise. Montana asserts that the NPS failed to consider Wyoming's economic analysis that showed an expected economic loss to Wyoming of between $131 million and $171 million under

Alternative G. A.R. 29198. Rather, the NPS concluded that Alternative G would have "a negligible to minor negative impact on the five-county economy and a negligible negative to positive impact on the three state economy...." A.R. 28807–08. The NPS relied on a summer visitor survey and a shift in participation rates to other winter activities, rather than considering the economic information provided by the cooperating agencies.

Montana also claims that the NPS ignored the expertise of the United States Forest Service ("USFS") and the State of Montana in considering the cumulative impacts of displacement to the surrounding areas. Both Montana and the USFS commented on the significant displacement of snowmobiles into areas around the Parks. A.R. 27205–207, 27427, 27186–189. Montana claims that this information was either glossed over or not considered by the NPS in its FEIS.

Federal Defendants claim that the NPS made diligent efforts to include cooperating agencies and took their comments seriously. Federal Defendants assert that the NPS is only required to consider and take seriously the comments of cooperating agencies and is not required to adopt them. Federal Defendants argue that the NPS included the cooperating agencies in the process and that nothing further is required of the NPS under NEPA.

■ The purpose of having cooperating agencies is to emphasize agency cooperation early in the NEPA process. 40 C.F.R. § 1501.6 (2004). Federal agencies are required to invite the participation of impacted states and provide them with an opportunity for participation in preparing an EIS. 40 C.F.R. § 1501.7 (2004). "When a federal agency is required to invite the participation of other governmental entities and allocate responsibilities to those governmental entities, that participation and delegation of duty must be meaning-

ful." *Wyoming v. USDA,* 277 F.Supp.2d 1197, 1219 (D.Wyo.2003).

■ The Court does not agree, and does not believe, that the record shows that the NPS gave any meaningful delegation of duty to the cooperating agencies. The record indicates that while the NPS was in the process of changing the preferred alternative as early as January 2000, the cooperating agencies were not informed of this decision until March 13, 2000. Even at the March meeting, the cooperating agencies were only informed of the planned switch in the preferred alternative; cooperating agencies were not provided a draft of revised Alternative G until April 20, 2000. A.R. 22670–22675. Additionally, at the March 2000, meeting the NPS indicated that Alternative G as presented in the DEIS would become the new preferred alternative, although the NPS had revised Alternative G as early as January 2000.

These actions by the NPS do not indicate good faith cooperation with cooperating agencies. Rather, these actions indicate a prejudged, political decision to ban snowmobiles in the Parks. The Court believes that the NPS failed its obligation to involve and seriously consider the comments of cooperating agencies.

### d. The NPS Deprived the Public of Meaningful Participation in the 2000 FEIS and ROD Process.

Plaintiffs and Plaintiff–Intervenors' final NEPA argument is that the NPS deprived the public of the opportunity to meaningfully participate in the development of the 2000 FEIS and ROD. Plaintiffs and Plaintiff–Intervenors argue that the NPS went out of its way to thwart public participation. For example, on October 20, 2000, there was notice of the receipt of FEIS for Yellowstone and Grand Teton National Parks; however this notice gave

no other information. 65 Fed.Reg. 63,076. The notice of the availability of the FEIS was not published in the Federal Register until October 31, 2000, the same day public comments on the FEIS were due. 65 Fed.Reg. 64986. Then, on November 22, 2000, the NPS issued its Record of Decision ("2000 ROD") adopting the snowcoach only alternative. A.R. 30330. On December 18, 2000, the NPS published its proposed regulation for implementing the snowcoach only alternative. 65 Fed.Reg. 79024–34. The NPS then gave the public an exact 30 day comment period. The comment period ended on January 17, 2001. Then, within 24 hours, and on the last night of the Clinton Administration, the Acting Assistant Secretary signed the final regulation implementing the 2000 ROD. 66 Fed.Reg. 7260 (January 22, 2001).

Plaintiffs and Plaintiff–Intervenors claim that the final regulation introduced an entirely new set of decision factors that were never included in any stage of the EIS process. Plaintiffs and Plaintiff–Intervenors also question the NPS's veracity that they were able to address all 5000 comments received during the final comment period, many of which were lengthy and received on the last day. ISMA Plaintiffs also claim that the Final Rule had been completed and sent to the Office of Management and Budget on January 10, 2001, seven days prior to the public comment period deadline.

The comment period for the FEIS was the only opportunity for the public to comment on Revised Alternative G during the NEPA process. While a copy of the FEIS was available on the NPS website on October 10, 2000, through publishing error, notice of the availability of the FEIS did not appear in the Federal Register until October 31, 2000. This essentially allowed less that 24 hours for public review and comment.

Both GYC and Federal Defendants assert that the NPS provided ample time for public comment. Federal Defendants respond that the decision to phase out snowmobiles was not a radical departure from the DEIS. Federal Defendants further assert there is no actual support for the argument that the NPS did not adequately review public comments on the 2001 Snowcoach Rule.

In reviewing the decision making process the court will not accept *pro forma* compliance with NEPA procedures, nor *post hoc* rationalizations as to why and how the agency complied with NEPA. *See Davis v. Mineta*, 302 F.3d 1104, 1112–13 (10th Cir.2002); *Utahns for Better Transp.*, 305 F.3d at 1165.

■ The Court has no doubt that through the preparation of the DEIS the NPS followed NEPA procedures, working with the cooperating agencies and giving the public ample opportunity to respond to the DEIS. However, the facts evidence mere *pro forma* compliance with NEPA's procedures and requirements starting in January 2000, when the NPS made the prejudged political decision to ban snowmobiles in the Parks.

The Administrative Record in this case indicates the NPS was working on a revised Alternative G as early as January 2000. A.R. 25440–46. A draft Statement of Rationale Recommending a FEIS Preferred Alternative for YNP/GTNP/JDRMP was being prepared by January 31, 2000. A.R. 25440–41 (Draft Revised Alternative G, dated January 31, 2000 and email asking for draft explanation for change in preferred alternative). Yet, cooperating agencies were not even informed of the proposed change in the preferred alternative until March 13, 2000. The NPS claims that the decision to change the preferred alternative to Revised Alternative G was based on public

comments; however, there were an equal amount of public comments supporting a revised Alternative E, which would have continued snowmobile use in the Parks. A.R. 28464.

Also, during the entire time from January through April 2000, the NPS was in the process of responding to comments from the DEIS. As indicated, about forty-five percent of these comments were in favor of a revised Alternative E. It appears to this Court that while the NPS responded to these comments they made no attempts to actually consider the comments. Rather, the NPS focused its energy on preparing Revised Alternative G to become the new preferred alternative.

### 3. Conclusion.

For all of the forgoing reasons, the Court believes that 2001 Snowcoach Rule was improperly promulgated. The 2001 Snowcoach Rule was the product of a pre-judged, political decision to ban snowmobiles from all the National Parks. Once the NPS had decided to ban snowmobiles from the Parks, the remainder of the NEPA process was nothing more than *pro forma* compliance. The 2001 Snowcoach Rule was rushed through the NEPA process and all along the way, the public was left out of the process.

### III. APA Violations.

Plaintiffs and Plaintiff–Intervenors assert that the NPS violated the APA by failing to explain its change in decision, failing to provide public participation and misapplying the law.

### A. Judicial Review of APA Compliance.

The essential function of judicial review under the APA is for the federal court to determine: "(1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Olenhouse,* 42 F.3d at 1574.

### 1. Failure to Explain the Change.

Plaintiffs and Plaintiff–Intervenors claim that the NPS violated the APA by failing to explain the change in its decision. Plaintiffs and Plaintiff–Intervenors claim that the NPS made an abrupt change from its 37 year practice and policy allowing snowmobile access to the Parks and also changed its preferred alternative from allowing snowmobiles into the Parks to a preferred alternative that would exclude snowmobiles. Plaintiffs and Plaintiff–Intervenors argue that the NPS violated the APA when it changed its policy with no explanation.

Federal Defendants assert that the decision to ban snowmobiles from the Parks was not a "radical departure" from the DEIS. Federal Defendants argue that Alternative G of the DEIS stated "[a]s technologies become available (are mass produced and available for public purchase) for reducing snowmobile and other oversnow motor vehicle sound and emissions to the above levels, the NPS would consider allowing them in the parks." A.R. 19184. Federal Defendants further assert that they explained the decision to change the preferred from B to G.

Between the DEIS and the FEIS, the NPS went from a preferred alternative that would have allowed a set number of snowmobiles into the Parks, to an alternative that phased-out snowmobile use and implemented snowcoach only access to the Parks. The NPS also changed preferred Alternative G from an alternative that considered allowing future use of snowmobiles in the Parks, to an alternative that permanently banned snowmobiles from the Parks.

■ The Court believes that the decision to adopt Revised Alternative G as the new preferred alternative in the FEIS was a radical departure from the policy used by the NPS in the park for almost forty years. It was a lot like banning all pickups in summer months would have been—a pretty radical move in our eyes.

After reviewing the administrative record, it appears to this Court that the NPS did not consider the impacts of increased snowcoach use in the Parks, the effectiveness of snowcoach transportation in the Parks' interior, or the real economic impacts to the surrounding areas.

The Court believes that the NPS's decision to change the preferred alternative without providing an explanation for this radical departure from the long-standing policy allowing snowmobiles in the Parks was arbitrary and capricious. This failure to adequately explain the change bolsters this Court's opinion that the decision to ban snowmobiles from the Parks was a prejudged, political decision, and is therefore arbitrary and capricious.

### 2. The NPS failed to Provide Public Participation.

Plaintiffs and Plaintiff–Intervenors additionally assert that the NPS violated the APA by failing to provide public participation. Federal Defendants assert that they provided the required public participation under the APA.

Plaintiffs and Plaintiff–Intervenors allege that the NPS failed to consider public comments, used abbreviated time lines and did not consider the public comments that were received.

■ The FEIS was published on the NPS's website on October 10, 2000; however, notice of the availability of the FEIS was not published in the Federal Register until October 31, 2000. The FEIS had a preferred alternative that was drastically different than the preferred alternative in the DEIS. This was the only opportunity that much of the public had to comment on the new preferred alternative, which had been revised from the DEIS. Yet, despite many reasons to give the public time to comment on the FEIS, the final day for comments on the FEIS was October 31, 2000, the same day the notice appeared in the Federal Register.

Then on November 22, 2000, the NPS issued the ROD, adopting revised Alternative G. 65 Fed.Reg. 80908. On December 18, 2000, the NPS published the proposed rule implementing the provisions of revised Alternative G. 65 Fed.Reg. 79024–34. This was followed by exactly 30 days of public comment. The comment period ended on January 17, 2001, and the 2001 Snowcoach Rule was signed on January 18, 2001, the last day of the Clinton administration. 66 Fed.Reg. 7268.

This Court believes that the NPS was clearly arbitrary and capricious in its actions leading up to FEIS, 2000 ROD and 2001 Snowcoach Rule. The NPS and/or the Clinton administration higher-ups had made a predetermined political decision, did not seriously consider public comments and performed mere *pro forma* compliance with NEPA. During this entire time the NPS ignored the purposes and procedures of NEPA and the APA in order to get this legislation approved before the end of the Clinton Administration.

### 3. The NPS misapplied the law.

ISMA Plaintiffs claim that the 2000 ROD is based on a misapplication of the law. ISMA claims that the NPS misinterpreted the Park Service Organic Act ("Organic Act") by determining that the conservation portion controlled and subjugated other obligations under the Organic Act. ISMA claims that there is a dual mandate to balance conservation with visitor enjoyment. ISMA asserts that the

NPS determined that conservation was the primary and, in this case, sole consideration.

 Federal Defendants reply that the NPS has broad statutory authority to manage and regulate the National Park System. "The test for whether the NPS has performed its balancing properly is whether the resulting action leaves the resources 'unimpaired for the enjoyment of future generations.'" *Southern Utah Wilderness Alliance v. Dabney,* 222 F.3d 819, 828 (10th Cir.2000).

 The Court does not believe that the Federal Defendants violated the Organic Act by allowing snowcoach only transportation in the Parks. The determination that snowcoach only transportation as a means of providing visitor access, while protecting the Parks' natural resources, was a decision that was within the discretion of the NPS, even though for obvious reasons it was a wrong-headed decision, based on poor judgment.

## B. Conclusion

The Court **FINDS** that the NPS violated the APA in promulgating the 2001 Snowcoach Rule. The NPS failed to adequately explain its radical departure to ban snowmobiles in the Parks. Additionally, the NPS failed to provided meaningful public participation throughout the NEPA process. For all of these reasons the Court **FINDS** that the 2000 FEIS, 2000 ROD and 2001 Snowcoach Rule must be vacated and remanded to the NPS.

### Conclusion

The Court **FINDS** that the NPS violated both NEPA and the APA in its rush to push through the politically predetermined ban on snowmobiles in the Parks. NEPA's purpose is to prescribe the process for the public to meaningfully participate in a federal agency's major federal action that significantly affects the quality of the human environment. In a case as important as this, where the agency action was driven by political haste, poor judgment, and only *pro forma* compliance with NEPA and the APA, it is the province of the Court to vacate the 2000 FEIS, 2000 ROD and 2001 Snowcoach Rule.

For all the aforementioned reasons, the Court **FINDS** that: (1) the issues in this case are not moot; (2) the NPS failed to take a hard look at the environmental impact of the revised Alternative G; (3) the decision to ban snowmobiles in the Yellowstone and Grand Teton National Parks was a politically prejudged political decision; (4) the NPS failed its obligation to cooperating agencies; (5) the NPS did not misapply the Organic Act; and (6) the 2000 FEIS, 2000 ROD and 2001 Snowcoach Rule were promulgated in violation of the National Environmental Policy Act and the Administrative Procedures Act. As a result of these findings, the 2000 FEIS, 2000 ROD and 2001 Snowcoach Rule must be set aside.

Therefore, the Court **ORDERS** that the 2000 Final Environmental Impact Statement, 2000 Record of Decision and 2001 Snowcoach Rule, be **VACATED** and **REMANDED** to the National Park Service for further proceedings.