The **WYOMING LODGING AND RESTAURANT ASSOCIATION, a Wyoming nonprofit corporation, Plaintiff,**

**The State of Wyoming, Plaintiff–Intervenor,**

v.

**UNITED STATES DEPARTMENT OF THE INTERIOR; The National Park Service; Gale Norton, in her official capacity as Secretary of the Department of the Interior; and Fran Mainella, in her official capacity as Director of the National Park Service, Defendants.**

No. 04–CV–315–B.

United States District Court,
D. Wyoming.

Oct. 14, 2005.

Steven F. Freudenthal, Freudenthal, Salzburg, & Bonds, P.C., Monique J. Ojeda, Freudenthal, Salzburg, & Bonds, P.C., Cheyenne, for Plaintiff.

Patrick J. Crank, Attorney General, State of Wyoming, Jay Jerde, Deputy Attorney General, State of Wyoming, Thomas W. Rumpke, Senior Assistant Attorney General, State of Wyoming, Cheyenne, for Plaintiff–Intervenor.

Matthew H. Mead, United States Attorney, Nicholas Vassallo, Assistant United States Attorney, Cheyenne, Lauren Fischer, United States Department of Justice, Environmental and Natural Resources Division, General Litigation Section, Kelly A. Johnson, Acting Assistant Attorney General, Environment and Natural Resources Division, Andrew C. Emrich, Counsel to the Assistant Attorney General, Environment and Natural Resources Division, Washington, D.C., for Defendants.

## ORDER

BRIMMER, District Judge.

This matter is before the Court upon Plaintiff's Complaint and Plaintiff–Interve-nor's Complaint, both of which challenge decisions of the United States Department of the Interior and the National Park Service. After considering the administrative record, reading the briefs, reviewing the materials on file, having heard oral argument, and being fully advised in the premises, the Court **FINDS** and **ORDERS** as follows:

## STATEMENT OF PARTIES AND JURISDICTION

Plaintiff Wyoming Lodging & Restaurant Association ("WLRA") is a non-profit corporation organized under Wyoming law. The WLRA is comprised of approximately 400 members, all of whom are involved in the Wyoming lodging and restaurant industry.

Plaintiff–Intervenor State of Wyoming ("Wyoming") intervened in this matter based upon its economic and sovereign interests directly related to recreational snowmobiling in Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller, Jr., Memorial Parkway.[1]

Defendant United States Department of the Interior is an executive branch agency of the United States of America responsible for managing national parks in the United States, including Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller, Jr., Memorial Parkway. Defendant National Park Service ("NPS") is a bureau of the United States Department of the Interior. The National Park Service is responsible for promoting and regulating the use of the national parks in the United States. Defendant Gale Norton is sued in her official

---

1. Plaintiff and Plaintiff–Intervenor are, at times, jointly referred to as "Plaintiffs" in the remainder of this Order.

capacity as the Secretary of the Department of the Interior. Defendant Fran Mainella is sued in her official capacity as the Director of the National Park Service. All of the Defendants will be collectively referred to as "Federal Defendants" or "Defendants."

Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346(a)(2) (United States as a defendant), and 5 U.S.C. §§ 702–706 (Administrative Procedure Act right of review). Venue is appropriate under 28 U.S.C. § 1391(b) & (e).

## BACKGROUND

The case now before the Court is the most recent link in an extended chain of litigation regarding the use of snowmobiles in Yellowstone National Park ("Yellowstone"), Grand Teton National Park ("Grand Teton"), and the John D. Rockefeller, Jr., Memorial Parkway ("Parkway") (collectively referred to as "the Parks"). This complex and convoluted saga of related suits encompasses five cases, two separate courts in two different circuits, and over twenty-five parties.[2] *See, e.g., Fund For Animals v. Norton,* 352 F.Supp.2d 1 (D.D.C.2005); *Int'l Snowmobile Manufacturers Ass'n v. Norton,* 340 F.Supp.2d 1249 (D.Wyo.2004); *Fund for Animals v. Norton,* 323 F.Supp.2d 7 (D.D.C.2004); *Int'l Snowmobile Manufacturers Ass'n v. Norton,* 304 F.Supp.2d 1278 (D.Wyo.2004); *Fund for Animals v. Norton,* 294 F.Supp.2d 92 (D.D.C.2003).

The Fund for Animals organization brought the first snowmobile suit against the NPS in 1997.[3] In that case, Fund for Animals challenged the then-existing Yellowstone winter use rules, which allowed snowmobiles into the Parks on an essentially unlimited basis, on the grounds that they violated the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA"). *See Int'l Snowmobile Manufacturers Ass'n v. Norton,* 340 F.Supp.2d at 1253–54. Ultimately, the Fund for Animals and the NPS reached a settlement in which the NPS agreed to prepare an environmental impact statement ("EIS") that focused on snowmobile use and trail grooming in Yellowstone. *Id.* at 1254.

Upholding their end of the bargain, the NPS issued a Draft EIS ("1999 DEIS") on winter use in the Parks on September 29, 1999. *Id.* The 1999 DEIS contained seven alternatives for winter use of the Parks, including several alternatives which would have continued snowmobile use in the Parks so long as the machines met new noise and emission standards. *Id.* One of these alternatives, Alternative B, was the preferred alternative for the NPS at the time the DEIS was issued.

Over a year later, in October 2000, the NPS published the final EIS ("2000 FEIS") for winter use in Yellowstone. *Id.* The 2000 FEIS was substantially different from the 1999 DEIS in that the last alternative had been revised and had become the preferred alternative. *Id.* The revised alternative, identified as Alternative G, allowed snowcoach entry into the Parks but prohibited all snowmobile access. *Id.* Alternative G was officially adopted by the NPS in a November 22, 2000, Record of

---

**2.** Because the cases and agency actions leading up to the case *sub judice* have been discussed at length by this Court on several prior occasions, the following discussion of facts and procedural history is somewhat abbreviated. For a complete and thorough recitation of the prior history of the snowmobile litigation, see *Int'l Snowmobile Manufacturers Ass'n v. Norton,* 340 F.Supp.2d 1249, 1253–56 (D.Wyo.2004).

**3.** *Fund For Animals v. Babbitt,* No. 97–1126(EGS) (D.D.C.).

Decision ("2000 ROD"). *Id.* The 2000 ROD was subsequently implemented by rule ("2001 Snowcoach Rule") on January 18, 2001, the last day of the Clinton Administration. *Id.* (citing 66 Fed.Reg. 7260, 7268 (January 22, 2001)).

The 2000 FEIS, 2000 ROD, and the 2001 Snowcoach Rule prompted several parties, including the International Snowmobile Manufacturers Association ("ISMA"), to bring suit against the NPS in this Court.[4] *Id.* Like ISMA and the other plaintiffs, the State of Wyoming was unhappy with the 2000 FEIS, 2000 ROD, and the 2001 Snowcoach Rule and, consequently, intervened in the suit shortly after its inception. *Id.* Several other groups intervened as Defendants in the suit. *Id.*

In June of 2001, the parties reached a settlement agreement which required the NPS to complete a supplemental EIS ("SEIS"), taking into account new snowmobile technology not included in the 2000 FEIS. *Id.* As part of the settlement, the parties requested this Court to stay all litigation until the SEIS was completed. *Id.* The stay was granted on July 2, 2001. *Id.* at 1254–55.

Approximately a year and half later, the NPS finished the SEIS ("2003 SEIS") and made it available to the public on February 24, 2003. *See* 68 Fed.Reg. 8618 (February 24, 2003). The 2003 SEIS identified Alternative 4 as the preferred alternative. Under this alternative, 950 snowmobiles would be allowed into Yellowstone per day. However, the majority of snowmobiles entering the park would be required to meet best available technology ("BAT") standards and would have to be accompanied by a guide. Alternative 4 was formally adopted by the NPS in a March 25, 2003, Record of Decision ("2003 ROD"). *Id.* at

1255; A.R. 92624–73. NPS published the final rule on December 11, 2003 ("2003 Rule"). *See* 68 Fed.Reg. 69,268 (December 11, 2003).

However, before the NPS had issued the final rule, several parties, including the Fund for Animals, challenged the 2003 SEIS and the 2003 ROD in the United States District Court for the District of Columbia ("D.C.Court").[5] The plaintiffs, although they were without question aware of this Court already having jurisdiction of this issue but obviously hoped for a District of Columbia judge of environmental disposition to give them a decision of their persuasion, alleged. that "snowmobiling and trail grooming cause air and noise pollution, threaten wildlife and endangered species, and create health threats to visitors and park employees." *Fund for Animals*, 294 F.Supp.2d at 97. Thus, given these alleged adverse effects, the plaintiffs argued that "NPS's decision to allow the continuation of these winter activities belie[d] the evidence collected during the rule-making process" and thus violated the Administrative Procedure Act ("APA"). *Id.* The D.C. Court agreed, and on December 16, 2003, only 5 days after the issuance of the 2003 Rule, found that the 2003 SEIS and the 2003 ROD were inadequate. *Id.* at 115. As a result, the D.C. Court vacated the 2003 SEIS, the 2003 ROD, and the 2003 Rule. *Id.* The D.C. Court also ordered the NPS to reinstate the 2001 Snowcoach Rule until directed to do otherwise by the court. *Id.*

Once the D.C. Court reinstated the 2001 Snowcoach Rule, the plaintiffs in the case then pending before this Court moved to lift the stay·then imposed. *Int'l Snowmobile Manufacturers Ass'n*, 340 F.Supp.2d at 1256. The Court lifted the stay on

---

**4.** *Int'l Snowmobile Manufacturers Ass'n v. Norton*, No. 00–CV–229–B (D.Wyo.).

**5.** *Fund for Animals v. Norton*, No. Civ. A. 02–2367(EGS) (D.D.C.).

December 31, 2003. *Id.* After the stay was lifted, the Plaintiffs moved the Court for an order preventing implementation of the 2001 Snowcoach Rule.

On February 10, 2004, this Court granted the plaintiff's motion and issued a Temporary Restraining Order prohibiting the NPS from implementing the 2001 Snowcoach Rule.[6] *Int'l Snowmobile Manufacturers Ass'n,* 304 F.Supp.2d at 1293–94. The Court further directed the NPS to "promulgate temporary rules for this 2004 snowmobile season that will be fair and equitable to snowmobile owners and users, to the business community, and to the environmental interests . . . ." *Id.* at 1294.

In an effort to comply with the Court's February 10, 2004, order, the NPS issued emergency rules, called Compendium Amendments, to govern snowmobile use in the Parks. A.R. 106205–106214. Under the Compendium Amendments, 920 snowmobiles would be allowed to enter the Parks each day for the rest of the 2004 winter season. *Id.* Of the allotted 920 entries, 780 could visit Yellowstone per day. A.R. 106213.

The NPS also moved the D.C. Court to amend its judgment entered on December 16, 2003. According to that order, the NPS was *required* to implement the 2001 Snowcoach Rule. *Fund for Animals,* 294 F.Supp.2d at 115. Obviously, the NPS was stuck between the proverbial rock and a hard place—the D.C. Court had ordered the NPS to implement the 2001 Snowcoach Rule and this Court had ordered the converse. Seeing that a comity problem had arisen, the D.C. Court granted the relief requested and relieved the NPS from en-

forcing the 2001 Snowcoach Rule. *Fund for Animals,* 323 F.Supp.2d at 10–11. The D.C. Court did, however, direct the NPS to develop a new rule for the 2004–2005 season. *Id.* at 11.

On October 14, 2004, this Court vacated the 2000 FEIS, the 2000 ROD, and the 2001 Snowcoach Rule. *Int'l Snowmobile Manufacturers Ass'n v. Norton,* 340 F.Supp.2d at 1266. In reaching such decision, the Court found that:

> [T]he NPS was clearly arbitrary and capricious in its actions leading up to FEIS, 2000 ROD and 2001 Snowcoach Rule. The NPS and/or the Clinton administration higher-ups had made a' predetermined political decision, did not seriously consider public comments and performed mere *pro forma* compliance with NEPA. During this entire time the NPS ignored the purposes and procedures of NEPA and the APA in order to get this legislation approved before the end of the Clinton Administration.

*Id.* at 1265.

In response to the various aforementioned court orders, the NPS began the process of promulgating new temporary winter use rules for the Parks. These temporary rules were intended to be implemented by the start of the 2004–2005 season and were to remain in effect until the NPS could establish permanent rules which addressed the concerns of this Court and the D.C. Court. A.R. 96958.

As part of this process, the Federal Defendants began to prepare an environmental assessment ("2004 EA"). The 2004 EA, which was first released for public comment on August 20, 2004, contained

---

**6.** In making the decision to issue a temporary restraining order, this Court found, as required by law, that Plaintiffs had a substantial likelihood of success on the merits in their challenge to the 2001 Snowcoach Rule. *Int'l Snowmobile Manufacturers Ass'n,* 304 F.Supp.2d at 1289–93. This Court also found that the 2001 Snowcoach Rule would cause "significant financial loss . . . that cannot be compensated if Wyoming and ISMA Plaintiffs prevail on the merits in this case." *Id.* at 1293.

five alternative actions. The proposed alternatives ranged in variety from prohibiting snowmobile entries into the Parks to permitting 1140 snowmobile entries per day. A.R. 95926–39. However, the alternatives allowing snowmobile entries (Alternatives 2–5) were all similar in that each alternative was based on daily snowmobile entry limits and required the snowmobiles to meet the BAT requirements. A.R. 95919, 95922.

Under Alternative 1, only snowcoaches would be allowed to enter the Parks; snowmobiles would be prohibited. A.R. 95926, 95940. This alternative was nearly identical to the 2001 Snowcoach Rule enjoined, and later vacated by this Court, in 2004. *See Int'l Snowmobile Manufacturers Ass'n v. Norton,* 340 F.Supp.2d at 1266; *Int'l Snowmobile Manufacturers Ass'n,* 304 F.Supp.2d at 1293–94; A.R. 95926.

Alternative 2 provided that 368 snowmobiles could enter the Parks each day. A.R. 95927. Of those, 318 were allotted for Yellowstone. *Id.* All snowmobiles entering Yellowstone would have to be accompanied by a commercial guide and would have to travel in groups of eleven (11) snowmobiles or less. A.R. 95927–28.

Alternative 3 permitted 540 snowmobiles to enter Yellowstone and 75 snowmobiles to enter Grand Teton and the Parkway. A.R. 95930. During the 2004–2005 season, all snowmobiles entering Yellowstone would have to be guided. A.R. 95931. However, starting in the 2005–2006 season, 95 of the snowmobiles entering Yellowstone each day could enter without a guide. *Id.*

Alternative 4, the preferred alternative, provided that 720 snowmobiles could enter into Yellowstone daily and a combined 140 snowmobiles could enter into Grand Teton and the Parkway daily. A.R. 95933. All snowmobiles entering Yellowstone would

have to be accompanied by a commercial guide. A.R. 95933. Additionally, like with Alternative 2, all snowmobiles entering Yellowstone would be limited to groups of eleven (11) or less. A.R. 95934.

Alternative 5 allowed 950 snowmobiles to enter Yellowstone and 190 snowmobiles to enter Grand Teton and the Parkway. A.R. 95936. During the 2004–2005 winter season, twenty percent (20%) of the snowmobiles entering Yellowstone each day could be unguided. *Id.* The remaining entries would have to enter with a guide. *Id.* During the ensuing seasons, eighty percent (80%) of the Yellowstone entries would be required to acquire a commercial guide while the other twenty percent (20%) could enter with a non-commercial guide. *Id.* The specifics of Alternative 5 were nearly identical to the 2003 Rule vacated by the D.C. Court on December 16, 2003. *See Fund for Animals,* 294 F.Supp.2d at 115 (vacating 2003 Rule); 68 Fed.Reg. 69,268 (December 11, 2003); A.R. 95936.

On September 7, 2004, the Federal Defendants published a proposed temporary rule, in connection with the 2004 EA, which was intended to govern winter use in the National Parks for the 2004–2005 winter season, the 2005–2006 winter season, and, if necessary, the 2006–2007 winter season. A.R. 97340. The proposed rule adopted Alternative 4 from the 2004 EA as the basis for the temporary regulation. A.R. 97342. The NPS received comments on this proposed regulation until October 7, 2004. A.R. 97340.

On November 4, 2004, the Federal Defendants issued a Finding of No Significant Impact ("2004 FONSI") in connection with the 2004 EA. The 2004 FONSI adopted Alternative 4 from the 2004 EA with slight modifications. Six days later, on November 10, 2004, Federal Defen-

dants published the final temporary rule ("2004 Temporary Rule"), which took effect on December 10, 2004. *See* 69 Fed. Reg. 65,348 (November 10, 2004). The 2004 Temporary Rule formally implemented Alternative 4 as the governing winter use regulation for the Parks.

As one might expect, the issuance of the 2004 EA, the 2004 FONSI, and the 2004 Temporary Rule sparked more litigation in this ongoing saga. On November 4, 2004, the same day the NPS published the 2004 FONSI, the Fund For Animals brought suit in the D.C. Court challenging the 2004 EA and the 2004 FONSI.[7] On November 10, 2004, WLRA filed the instant suit in this Court challenging the validity of the 2004 EA, the 2004 FONSI, and the 2004 Temporary Rule.

In response to the dual actions pending before this Court and the D.C. Court, the Federal Defendants filed a motion with the D.C. Court to transfer the *Fund for Animals* case to the District of Wyoming. On November 23, 2004, the Federal Defendants filed an alternative motion requesting that this Court transfer the case at bar to the D.C. Court should the D.C. Court refuse to transfer the *Fund for Animals* case to the District of Wyoming. The November 23, 2004, motion also moved the Court to consolidate the two cases should the D.C. Court grant the motion to transfer. On January 5, 2005, the D.C. Court denied the Federal Defendants' motion. *See Fund for Animals*, 352 F.Supp.2d at 2 (order denying Federal Defendant's motion to transfer). Thereafter, on January 20, 2005, this Court, believing that this District is the proper forum for the snow-

mobile litigation, denied the Federal Defendant's alternative motion to transfer this case to the D.C. Court.[8] Consequently, the case at bar proceeded to a hearing on the merits.

## STANDARD OF REVIEW

▮▮▮ Judicial review of an agency's final action is governed by the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §§ 701 to 706; *Lujan v. Nat'l Wildlife Federation,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Fuel Safe Washington v. F.E.R.C.,* 389 F.3d 1313, 1322–23 (10th Cir.2004). This standard applies not only to claims asserting a violation of the APA, but also to those asserting NEPA violations. *See Fuel Safe Washington,* 389 F.3d at 1322–23. Under the APA, a federal court may set aside agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). An agency decision is arbitrary or capricious if: (1) the agency entirely failed to consider an important aspect of the issue; (2) the agency offered an explanation for its decision that was counter to the evidence before it; (3) the agency relied on factors that Congress did not intend for it to consider; or (4) the agency's decision is so implausible that it could not be ascribed to the product of agency expertise. *Colo. Envtl. Coalition v. Dombeck,* 185 F.3d 1162, 1167 (10th Cir.1999).

▮▮▮ In applying this deferential standard of review, a federal court is required to review the whole administrative record, or those parts of the record cited by the

---

7. *Fund for Animals v. Norton,* No. 04–1913(EGS) (D.D.C.).

8. Due to the fact that this Court and the D.C. Court each retained jurisdiction in this matter there is once again the possibility of the issuance of conflicting orders. This lurking comi-

ty problem weighs heavy on the Court's mind, as it did in the previous litigation. However, given the Court's belief that this District is the proper forum for a suit involving the Parks, there is little the Court can do to alleviate the situation.

parties. *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir.2002). The court reviews the administrative record to ensure the agency's decision was based on consideration of the relevant factors and was not the result of a clear error in judgment. *Colo, Envtl. Coalition*, 185 F.3d at 1167. In so reviewing, the court cannot substitute its judgment for that of the agency. *Utahns for Better Transp.*, 305 F.3d at 1164.

■ The essential function of judicial review under the APA is for the federal court to determine whether the agency: (1) acted within its scope of authority; (2) complied with prescribed procedures; and (3) acted in accordance with law (i.e., did not act arbitrarily or capriciously). *Olenhouse*, 42 F.3d at 1574. As part of this review, a court must also ensure that the agency action is supported by substantial evidence in the record. *Id.* In the end, administrative decisions may only be set aside for substantial procedural or substantive reasons. *Utahns for Better Transp.*, 305 F.3d at 1164. However, courts and agencies alike should be mindful that an "agency's rulemaking power is not the power to make law, it is only the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." *Sundance Assocs. v. Reno*, 139 F.3d 804, 808 (10th Cir.1998) (internal quotations and citations omitted).

## DISCUSSION

Plaintiff and Plaintiff–Intervenor claim that the 2004 EA, 2004 FONSI, and the 2004 Temporary Rule were issued in violation of NEPA and the APA. Specifically, Plaintiff and Plaintiff–Intervenor contend that the NPS violated NEPA because: (1) the NPS did not comply with NEPA in evaluating the commercial guide requirement; (2) the NPS failed to consider a reasonable range of alternatives; (3) the

NPS failed to analyze a "no action" alternative. In regards to the APA claim, Plaintiff and Plaintiff–Intervenor argue that (1) the NPS's conclusion that all snowmobiles must be accompanied by commercial guides is not supported by substantial evidence; (2) the NPS's conclusion that commercial guides lead to responsible wildlife viewing and a lessening of impacts to the natural soundscapes is not supported by a reasoned analysis; (3) the NPS's decision that more than 720 snowmobiles would cause significant adverse effects on the environment is not supported by substantial evidence; and (4) the NPS's decision that more than 720 snowmobiles would cause significant adverse effects on the environment is not supported by a reasoned analysis.

In response, the Federal Defendants argue that Plaintiff and Plaintiff–Intervenor have waived any challenges they may have to the ultimate agency decision regarding the Parks as they allegedly failed to submit comments during the administrative decision-making process. In the alternative, the Federal Defendants aver that the NPS should be afforded great discretion in promulgating rules and that the NPS did not exceed such discretion in issuing the 2004 EA, 2004 FONSI, and the 2004 Temporary Rule.

## I. Waiver Defense

■ As just stated, the Federal Defendants argue that Plaintiff and Plaintiff Intervenor should not be able to challenge the 2004 EA because neither party provided meaningful participation in the public processes by which such regulation was promulgated. According to Defendants, a party challenging federal agency action must participate in the notice and comment process before it may proceed in federal court to challenge such action. The Court, however, while agreeing with

the Defendants to some extent, disagrees with the Defendants' proposed bright-line rule for the following reasons.

■ In *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), the Supreme Court determined that a party wishing to challenge agency action must participate in the public process so that it alerts the agency of the party's positions and contentions and, therefore, allows "the agency to give the issue meaningful consideration." *Department of Transp. v. Public Citizen;* 541 U.S. 752, 764, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004); *Vermont Yankee*, 435 U.S. at 553–54, 98 S.Ct. 1197. *See also Wilson v. Hodel*, 758 F.2d 1369, 1373 (10th Cir.1985) ("[A] reviewing court will not consider contentions which were not pressed upon the administrative agency."). *But see City of Seabrook, Tex. v. United States Environmental Protection Agency*, 659 F.2d 1349, 1360–61 (5th Cir.1981) (holding that plaintiffs are not required to participate in the public process before challenging agency action).[9] The purpose of this rule is to ensure that reviewing courts do not substitute their "judgment for that of the agency on matters where the agency has not had an opportunity to make a factual record or apply its expertise." *New Mexico Environmental Imp. Div. v. Thomas*, 789 F.2d 825, 835 (10th Cir.1986). Agency action

should be "reviewed on the basis articulated by the agency, and on the evidence and proceedings before the agency at the time it acted." *Lewis v. Lujan*, 826 F.Supp. 1302, 1306 (D.Wyo.1992) (Johnson, J.) (citing *American Min. Congress v. Thomas*, 772 F.2d 617, 626 (10th Cir.1985)). "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but erred against objection made at the time appropriate under its practice." *Wilson*, 758 F.2d at 1372–73 (quoting *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952)). "A reviewing court usurps the agency's function when it sets aside the administrative determination on a ground not theretofore presented . . . ." *Unemployment Compensation Commission of Territory of Alaska v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946).

The rule is not, however, meant to preclude any particular party from bringing a suit to challenge agency action. It is not a strictly-construed jurisdictional prerequisite. A party is not always required to submit comments in order to challenge agency action. For example, the Supreme Court stated:

**9.** In *City of Seabrook*, the Fifth Circuit explained its reasoning for not requiring participation as a prerequisite to challenging agency action as follows:

[C]ourts should not generally hold a petitioner estopped from objecting to an agency rule because his specific objection was not made during the "notice and comment" period. The rule urged by EPA would require everyone who wishes to protect himself from arbitrary agency action not only to become a faithful reader of the notices of proposed rulemaking published each day in the Federal Register, but a psychic able to

predict the possible changes that could be made in the proposal when the rule is finally promulgated.

*City of Seabrook*, 659 F.2d at 1360–61. Although the Court finds this reasoning somewhat persuasive, it does not appear that the Tenth Circuit would follow this line of thinking to the conclusion reached by the Fifth Circuit. *See, e.g., Holy Cross Wilderness Fund*, 960 F.2d at 1528 n. 18. *But see Big Horn Coal Co. v. Temple*, 793 F.2d 1165, 1170–71 (10th Cir.1986) (Barrett, J., specially concurring) (discussing the rule established by *City of Seabrook* and other similar cases).

Admittedly, the agency bears the primary responsibility to ensure that it complies with NEPA ... and an EA's or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action.

*Department of Transp.*, 541 U.S. at 765, 124 S.Ct. 2204. *See also Holy Cross Wilderness Fund*, 960 F.2d at 1528 n. 18 (noting that regardless of public comment an agency always has the duty to consider all reasonable and practicable alternatives).

■ As stated above, the rule is intended to give the agency a chance to review the information submitted during the public process and make a decision based upon that information. The purpose of the rule is not to create a jurisdictional requirement for suits challenging agency action. Thus, so long as the agency is informed of a particular position and has a chance to address that particular position, any party may challenge the action based upon such position whether or not they actually submitted a comment asserting that position. *See Benton County v. United States Dept. of Energy*, 256 F.Supp.2d 1195, 1198–99 (E.D.Wash.2003)("Under the rule established in *Vermont Yankee*, a plaintiff, *or another*, must bring sufficient attention to an issue to stimulate the agency's attention and consideration of the issue during the environmental analysis comment process." (emphasis added)). *See also New Mexico Environmental Imp. Div.*, 789 F.2d at 835

(noting that because neither plaintiff "nor anyone else advanced any dissatisfaction" to the agency action, plaintiff could not later challenge the action before the courts.)

In this case, Defendants contend that Plaintiff and Plaintiff–Intervenor did not alert the NPS of their positions, during the administrative process, in regards to their contentions that: (1) the NPS failed to take a hard look at the commercial guiding requirement, (2) the NPS failed to consider an alternative that includes seasonal as opposed to daily entry limits, and (3) the NPS failed to include a "no action" alternative. However, after reviewing the administrative record, it is clear that the NPS was alerted to the positions now asserted by Plaintiff and Plaintiff–Intervenor, regardless of which commentor actually notified Defendants of such positions.[10]

For example, Wyoming specifically commented on the guiding requirement by noting that it supported a twenty percent (20%) non-commercial guiding requirement. A.R. 104934. The States of Idaho and Montana also suggested that a large amount of the entries into Yellowstone should be unguided. A.R. 104874, 104656. In fact, a total of 1173 comments were received regarding the guiding requirement contained in the 2004 Temporary Rule. A.R. 105239–40.

Wyoming also submitted comments regarding the daily entry limits. *See* Plaintiff–Intervenor's Motion to Supplement the Administrative Record at Exhibit A. Specifically, Wyoming stated as follows:

**10.** The Court notes that the administrative record in this case has been supplemented with comments that were submitted by Wyoming and subsequently excluded from the record due to a computer malfunction. *See The Wyoming Lodging and Restaurant Association et al. v. United States Department of the Interior et al.*, No. 04–CV–315–B (D.Wyo. Sept.29, 2005) (Order on Plaintiff–Intervenor's State-

ment of Reconsideration of Magistrate's Order Denying the Motion to Supplement the Record); Plaintiff–Intervenor's Motion to Supplement the Administrative Record. Thus, some references to the administrative record will actually cite Plaintiff–Intervenor's proposed appendix, which has now been accepted by the Court as part of the administrative record.

Please consider regulating outfitter snowmobile entries to the Parks and Parkway based upon a total number of entries per operator per season basis. When entry permits are allocated on a per day basis, operators do not have enough permits to satisfy demand on some days, and have permits that go unused on some days. By allocating entry permits on a per season basis, the operator would have the discretion to determine when the permits will be used, thereby resulting in a more efficient use of entry permits.

*Id.* The State of Montana also made comments regarding the problems caused by daily limits when it noted that "peak days" are eliminated under the preferred alternative. A.R. 104885; *see also* A.R. 104658.

The record also contains comments on the "no action" alternative. For example, the International Snowmobile Manufacturers Association commented that the "no action" alternative should be park management under the 1983 regulations, not a snowmobile ban in the Parks. A.R. 104896. Another commentor stated that the scoping document did not identify a "no action" alternative, which is similar to the assertion made by Plaintiff and Plaintiff–Intervenor in this case. *See* A.R. 104649.

As Defendants correctly point out, there are many cases where the courts have held that a plaintiff could not challenge an agency action because he or she did not participate in the public rule making processes. *See, e.g., Department of Transp.,* 541 U.S. at 764–65, 124 S.Ct. 2204; *Vermont Yankee,* 435 U.S. at 553–54; 98 S.Ct. 1197; *New Mexico Environmental Improvement Division,* 789 F.2d at 835; *Wilson,* 758 F.2d at 1373. However, these cases can be distinguished from this case in that neither the plaintiff nor any other party in the cited cases submitted comments to the agency in opposition to the proposed action. Thus, the agency was not given a fair opportunity to address the concerns of the plaintiff. *See Wilson,* 758 F.2d at 1372–73. In this case, however, thousands of comments were filed and many of the comments addressed the issues raised by Plaintiff and Plaintiff–Intervenor in their complaints. Thus, the purpose of the rule—fairness to the agency—has been fulfilled and the claims of Plaintiff and Plaintiff–Intervenor are properly before this Court. *See id.*

## II. NEPA Claims

As previously noted, Plaintiff and Plaintiff Intervenor contend that the NPS did not fulfill the requirements of NEPA when it promulgated the 2004 EA, 2004 FONSI, and 2004 Temporary Rule. Specifically, Plaintiff and Plaintiff Intervenor allege that: (1) the NPS did not comply with NEPA in evaluating the commercial guide requirement; (2) the NPS failed to consider a reasonable range of alternatives; and (3) the NPS failed to analyze a "no action" alternative. The Court will analyze these claims in turn below.

### A. NEPA Overview

NEPA requires federal agencies to consider the environmental impacts of their actions, disclose those impacts to the public, and then explain how their actions will address those impacts. *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). NEPA prescribes the process, not the end result, of agency action. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In this regard, the Tenth Circuit has repeatedly emphasized that

NEPA only requires an agency to take a "hard look" at environmental consequences before taking a major federal action that significantly affects the quality of the human environment. *Citizens' Comm. to Save Our Canyons v. United States Forest Service,* 297 F.3d 1012, 1022 (10th Cir. 2002). "[O]nce environmental concerns are adequately identified and evaluated by the agency, NEPA places no further constraint on agency actions." *Friends of the Bow v. Thompson,* 124 F.3d 1210, 1213 (10th Cir.1997) (internal quotations and citation omitted). A court may not find agency action lacking simply because it would have reached a different decision. *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (quoting *Vermont Yankee,* 435 U.S. at 558, 98 S.Ct. 1197). To put it quite simply, "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson,* 490 U.S. at 351, 109 S.Ct. 1835.

■ Thus, based upon the foregoing, the role of the judiciary in the NEPA process is twofold. First, the court must ensure that the agency has taken a hard look at the environmental consequences of its actions and has adequately disclosed those impacts to the public. *Baltimore Gas & Elec. Co.,* 462 U.S. at 97–98, 103 S.Ct. 2246; *Utahns for Better Transp.,* 305 F.3d at 1163. Second, the court must ensure that the agency's decisions were not arbitrary or capricious. *Baltimore Gas & Elec. Co.,* 462 U.S. at 97–98, 103 S.Ct. 2246; *Utahns for Better Transp.,* 305 F.3d at 1163. While a federal agency is entitled to a presumption of regularity in arriving at its decision, the court is not simply a "rubber stamp" for agency action and will set aside agency action if it is in contravention of the agency's own rules or congressional mandate. *See Glisson v. United States Forest Service,* 876 F.Supp. 1016,

1023–24 (S.D.Ill.1993). In other words, the court will not accept *pro forma* compliance with NEPA procedures, nor post hoc rationalizations as to why and how the agency complied with NEPA. *See Utahns for Better Transp.,* 305 F.3d at 1165; *Davis v. Mineta,* 302 F.3d 1104, 1112–13 (10th Cir. 2002).

■ Under NEPA, any agency proposing "major Federal action[ ] significantly affecting the quality of the human environment" must prepare an environmental impact statement ("EIS"). 42 U.S.C. § 4332. "When it is unclear whether a proposed action requires an EIS, the agency may first prepare a less detailed environmental assessment ("EA")." *Greater Yellowstone Coalition v. Flowers,* 359 F.3d 1257, 1274 (10th Cir.2004) (citing 40 C.F.R. § 1501.4(b)). The EA is, essentially, a less detailed version of an EIS intended to "briefly provide sufficient evidence and analysis for determining whether to prepare an EIS ...." *Utah Shared Access Alliance v. United States Forest Service,* 288 F.3d 1205, 1213 (10th Cir.2002). "If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact ("FONSI") and forego the further step of preparing an EIS." *Greater Yellowstone Coalition,* 359 F.3d at 1274 (citing 40 C.F.R. § 1501.4(e); *Lee v. United States Air Force,* 354 F.3d 1229, 1237 (10th Cir. 2004)).

**B. Did the NPS Fail to Comply with NEPA in Evaluating the Commercial Guide Requirement?**

■ According to NEPA, "an agency takes a sufficient 'hard look' when it obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns

that are raised." *Hughes River Water-shed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir.1999) (citing *Marsh*, 490 U.S. at 378–85, 109 S.Ct. 1851). In this case, Plaintiff and Plaintiff–Intervenor allege that the NPS failed to meet this standard in evaluating the commercial guiding requirement. Plaintiffs contend that the NPS prejudged the guiding requirement and did not support its conclusions with any meaningful analysis. Specifically, Plaintiffs contend that the research leading to the conclusion that commercial guiding ensures responsible wildlife viewing and ameliorates impacts to natural soundscapes was inadequate.

### 1. Responsible Wildlife Viewing

Plaintiffs allege that the NPS only relied upon law enforcement statistics in reaching the conclusion that commercial guiding ensures responsible wildlife viewing. Essentially, Plaintiffs claim that such statistics are irrelevant to environmental review and cannot constitute meaningful review. The Court, however, disagrees for three reasons.

First, the law enforcement statistics are full of facts which tend to support the NPS's conclusion. For example, the law enforcement statistics demonstrate that under the commercial guiding program, the number of law enforcement cases fell from 383 to 172, arrests declined from twenty-one (21) to two (2), and moving violations were reduced from 238 to forty-four (44). A.R. 95959. Surely, no one can argue that a decrease in irresponsible drivers does not reduce the impact on wildlife in the Parks. It seems that irresponsible drivers would not only have tendency to disobey the law, but also to harass and endanger the animals within the Parks. Thus, the Court cannot say that these statistics are irrelevant.

Second, an agency is entitled to deference in determining which methodologies to use in making decisions. *See Citizens' Committee to Save Our Canyons*, 297 F.3d at 1027 ("[C]ourts defer to the expertise and discretion of the agency to determine proper testing methods." (internal quotations and citation omitted)); *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1130 (8th Cir.1999); *C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1573 (11th Cir.1988). This is especially true "with respect to questions involving engineering and scientific matters." *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989). Thus, so long as the chosen method has a rational basis and examines the relevant factors, it is not within the Court's province to determine that the methodology used is improper. *Committee to Preserve Boomer Lake Park v. Department of Transp.*, 4 F.3d 1543, 1553 (10th Cir.1993). In this case, the Court cannot say that reliance upon law enforcement statistics was irrational.

Third, the Court is confident that the aforementioned law enforcement statistics were not the only basis for the agency's decision. The record contains many other facts which support the conclusion that guides reduce the impacts on animals. In one expert report, the authors note that animal fatalities caused by snowmobiles were reduced from seven (7) in 2003, when guides were not required for all visitors, to zero (0) in 2004, when guides were required for all visitors. A.R. 105881. The same report also shows that the percentage of visitors that dismounted their snowmobile and approached park animals declined under the commercial guiding program. A.R. 105878. This data only serves to bolster the NPS's decision.

### 2. Natural Soundscapes

Plaintiffs take issue with the NPS's analysis regarding the impact of

commercial guides on the natural soundscapes. Plaintiffs allege that the NPS made faulty assumptions, utilized an improper method of analysis, and failed to consider evidence contradictory to the final conclusion. All of these contentions lack merit.

In regards to the assumptions made by the NPS, it is not the function of this Court "to decide what assumptions ... we would make were we in the Secretary's position, but rather to scrutinize the record to ensure that the Secretary has ... provided a reasoned explanation for his policy assumptions ...." *American Iron & Steel Institute v. Occupational Safety and Health Admin.,* 939 F.2d 975, 982 (D.C.Cir.1991). In this case, the NPS has clearly provided a reasonable explanation for the assumptions used in formulating the 2004 Temporary Rule. For instance, Plaintiffs contend that the assumption that guided groups usually contain eight (8) snowmobiles and unguided groups contain five (5) is irrational and unfounded. NPS, however, states that these assumptions are based upon entry data collected at the Park. *See* A.R. 103968–104018. Assumptions based on entry data undoubtedly satisfy the reasoned explanation test outlined above.

■ Plaintiffs also challenge the assumption that commercial guiding reduces the amount of time that snowmobiles are audible in the Park. However, the NPS also provided a reasonable basis for this assumption:

Obviously, more vehicles are audible for a greater percentage of time and are louder than fewer vehicles. Snowmobiles that remain grouped together rather than individually spread out reduces the percent time audible at any one point along a travel route and increases the time when only natural sounds are audible. As group size increases, the overall sound level increases, but this increase is offset by the reduction in audibility between the presence of groups.

A.R. 96007. *See also* A.R. 96964, 99711.

■ Plaintiffs next argue that the method used by NPS to measure the effects of snowmobiles on the natural soundscapes was flawed. More specifically, Plaintiffs contend that the NPS wrongly compared the 2003 SEIS and the 2004 EA to reach its conclusion. However, as with the assumptions made by NPS, it is not the Court's duty to second guess the testing methods used by the NPS so long as they are "not arbitrary or without foundation." *Friends of Boundary Waters Wilderness,* 164 F.3d at 1130. As noted by the Eighth Circuit:

We may not second-guess the values assigned to the environmental impacts considered in an agency study; and NEPA does not anticipate that courts will determine the merits of conflicting views between two or more schools of scientific thought. It is not the role of this court to choose between differing studies or differing expert views. We defer to the agency's reasoned explanation.

*Id.* (internal citations omitted).

In this case, the Court finds that the methods used by NPS are not arbitrary and are not without foundation. As explained by NPS, and contrary to Plaintiffs' contentions, the 2004 EA does not base its audibility study on the 2003 SEIS. Rather, the conclusion reached in the 2004 EA was based upon new studies completed during the 2002–2003 and 2003–2004 seasons. *See* A.R. 96002–96017; *see also* 105428–91. The 2004 EA also contains an adequate explanation regarding the basis for the analysis. *See* A.R. 96006–96007. However, even if the NPS had compared the 2003

SEIS and the 2004 EA to reach a conclusion regarding the audibility analysis, the Court cannot say that such methodology would be irrational or without foundation.

In their final argument regarding the effects of commercial guiding on the soundscapes, Plaintiffs aver that the NPS failed to consider evidence which contradicts the NPS's final conclusion. Specifically, Plaintiffs contend that the NPS did not analyze the impact of group size when making its predictions concerning audibility in the 2004 EA. The 2004 EA, however, does address this precise issue. For example, on pages 104 and 105, the 2004 EA contains analytical tables describing the effect of group size on decibel levels and the distance to limit of audibility. A.R. 96004–05. There is also other evidence in the record regarding the impact of group size on audibility. This evidence is set forth in the report entitled Natural Soundscape Monitoring in Yellowstone National Park December 2003—March 2004. See A.R. 105493, 105544. In the report, the author stated, "Up to a certain level, the greater the number of snowmobiles and snowcoaches using the park the greater the time they are audible. Grouping snowmobiles and requiring best available technology for sound emission reduces the direct relationship between vehicle numbers and audibility." A.R. 105544.

Based upon the evidence in the record, and contrary to Plaintiffs' contentions, it is clear that the NPS took a "hard look" at the effect of group size on audibility. Therefore, the Court finds that Plaintiffs' argument on this issue must fail as well.

### 3. Conclusion

For the reasons just stated, the Court finds that the NPS took a hard look at all aspects of the guiding requirement. However, in saying that, the Court must state that this conclusion is not the one that it would prefer. The Court can think of at least half a dozen responsible Wyoming natives with snowmobiles who observe the rules and are concerned about the wildlife and therefore need no guides and would regard the guiding fee as an excessive tax or surcharge. But, the Court's duty is to comply with the decided cases and not invent its own findings on the guide issue. The Plaintiffs' argument must fail for the reasons aforesaid.

### C. Did the NPS Fail to Consider a Reasonable Range of Alternatives?

Plaintiffs contend that the NPS failed to consider a reasonable range of alternatives in the 2004 EA. More particularly, Wyoming and the WLRA argue that the NPS should have considered an alternative based upon seasonal entry limits rather than daily entry limits.

Under NEPA and its corresponding regulations, "government agencies must 'include in every recommendation or report on proposals' detailed statements analyzing 'alternatives to the proposed action.'" *Citizens' Committee to Save Our Canyons*, 297 F.3d at 1030 (quoting 42 U.S.C. § 4332(C)(iii)). However, "[d]etermining the alternatives to be studied is a matter left to the agency's discretion." *Jackson Hole Conservation Alliance v. Babbitt*, 96 F.Supp.2d 1288, 1298 (D.Wyo.2000) (Brimmer, J.); *see also City of Aurora v. Hunt*, 749 F.2d 1457, 1467 (10th Cir.1984), *overruled on other grounds, Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir.1992). An agency only needs to review reasonable alternatives. 40 C.F.R. § 1502.14; *Citizens' Committee to Save Our Canyons*, 297 F.3d at 1030. "An agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective."

City of Aurora, 749 F.2d at 1467. Furthermore, an agency need not "include every possible alternative." *Lidstone v. Block*, 773 F.2d 1135, 1137 (10th Cir. 1985). The agency need only set forth alternatives sufficient to permit a reasoned choice. *See Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1039–40 (10th Cir.2001); *Associations Working for Aurora's Residential Environment v. Colorado Dept. of Transp.*, 153 F.3d 1122, 1130 (10th Cir.1998).

"It must also be noted that the agency's duty to consider alternatives in preparing an EA is a lower duty than the duty to consider alternatives in preparing an EIS." *Jackson Hole Conservation Alliance*, 96 F.Supp.2d at 1298; *see also Mt. Lookout–Mt. Nebo Property Protection Ass'n v. F.E.R.C.*, 143 F.3d 165, 172 (4th Cir.1998). An EA only requires brief discussions of the alternatives. 40 C.F.R. § 1508.9(b). Conversely, an agency preparing an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14.

In the case *sub judice*, there can be no question that the NPS met the requirements of NEPA in regards to evaluating the alternatives to the proposed action. The EA contains and discusses five alternatives that range from prohibiting snowmobiles in Yellowstone to allowing 950 snowmobiles into the Park each day. As noted by Defendants, the EA contains over eighty pages analyzing the environmental consequences of each alternative. *See* A.R. 95987–96068. The information contained within these pages provided the NPS with a plethora of information regarding the environmental impacts of each alternative. For instance, the EA includes a detailed discussion regarding how each alternative would affect air quality, animals in the Parks, natural soundscapes, and human health and safety.

Therefore, based upon the foregoing, the Court finds that the NPS considered a reasonable range of alternatives. The five alternatives discussed by the NPS undoubtedly allowed the agency to make a "reasoned decision." The fact that Plaintiffs can conceive another alternative does not make the range of alternatives unreasonable or insufficient. *See Lidstone*, 773 F.2d at 1137; *Custer County Action Ass'n*, 256 F.3d at 1039–40; *Associations Working for Aurora's Residential Environment*, 153 F.3d at 1130.

**D. Did the NPS Fail to Analyze a "No Action" Alternative?**

In their final NEPA argument, Plaintiffs contend that the NPS failed to identify and analyze a "no action" alternative in the 2004 EA as required by NEPA. *See* 40 C.F.R. § 1508.9(b); *Custer County Action Ass'n*, 256 F.3d at 1040. The record does not support this contention. The EA explicitly discusses the "no action" alternative in the following terms:

At present, the identification of a no action alternative is uncertain, therefore several alternatives are being treated as no action for the purpose of the EA. A complicating factor in determining the no action alternative for this EA is the uncertain outcome of the proceedings in separate U.S. District Courts, which may result in several possible no action alternatives. One no action alternative could be the snowcoach-only alternative. This was the no action alternative in the SEIS, and it is incorporated as alternative 1 in this EA. It was also the alternative selected by the NPS in the 2000 winter use plan and 2001 implementing regulations.

A second no action alternative would be to continue the park superintendents' compendia that were amended in February 2004 following the February 10,

2004, decision by the U.S. District Court for the District of Wyoming. As of the writing of this EA, neither the February 10, 2004, injunction has been formally dissolved, nor have the compendia amendments been rescinded. Alternative 4 in this EA most closely matches the provisions of the superintendents' compendia amendments.

A third no action alternative would be to adhere to the 1983 regulations that governed snowmobile use in the parks prior to promulgation of the 2001 regulations. The regulations are supported by the 1990 winter use plan and environmental assessment. They restrict snowmobile use to designated routes in the parks. However, the 1983 regulations describe a type and amount of snowmobile use that was found to constitute impairment of park resources and values in the 2000 EIS and 2003 SEIS. This alternative may not be legally permissible and thus does not meet the purpose and need's criteria for detailed consideration in this EA. However, comparisons are made throughout this EA between the alternatives and the historical conditions represented by the 1983 regulations. Thus the reader can compare the different alternatives with regulated and managed snowmobile use (or snowcoaches only) with the historical use levels and vehicle types.

A.R. 95925–26.

In the Court's opinion, this language more than satisfies the requirements of NEPA. Plaintiffs, however, seem to take issue with this section of the EA because it did not set forth one, and only one, definite "no action" alternative. As explained by the NPS in the quoted language from the EA, the agency could not accurately predict the "no action" alternative due to the ongoing litigation. Had the agency attempted to do, the chosen "no action" alternative may have been invalidated by court order in the pending suits. If this had happened, the EA would have violated NEPA for its failure to include a "no action" alternative. Thus, the NPS followed the only logical course and included all possible "no action" alternatives. The Court can find no error in this decision and, therefore, concludes that the EA contained, and the NPS discussed and analyzed, a valid "no action" alternative.

## III. APA Claims

 In their remaining claims, WLRA and Wyoming allege that the NPS violated the APA in issuing the 2004 EA, the 2004 FONSI, and the 2004 Temporary Rule because (1) the NPS's conclusion that all snowmobiles must be accompanied by commercial guides is not supported by substantial evidence; (2) the NPS's conclusion that commercial guides lead to responsible wildlife viewing and a lessening of impacts to the natural soundscapes is not supported by a reasoned analysis; (3) the NPS's decision that more than 720 snowmobiles would cause significant adverse effects on the environment is not supported by substantial evidence; and (4) the NPS's decision that more than 720 snowmobiles would cause significant adverse effects on the environment is not supported by a reasoned analysis. Each of these claims is discussed below.

The general standard for evaluating the following APA claims is fully described above. However, in its simplest form, the standard requires the Court to determine: "(1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Olenhouse,* 42 F.3d at 1574.

**1218**

### A. Is the NPS's conclusion that all snowmobiles must be accompanied by commercial guides supported by substantial evidence?

In their first APA claim, Plaintiffs contend that the NPS's conclusion that · all snowmobiles must be accompanied by commercial guides is not supported by substantial evidence. This argument is very similar to Plaintiffs' NEPA claim regarding the commercial guiding requirement. Essentially, Plaintiffs claim that the evidence in the administrative record does not support the conclusion that commercial guides ameliorate environmental impacts. The Court must, however, based upon the standard of review applicable to such a claim, disagree with WLRA and Wyoming.

▇▇▇ The applicable Tenth Circuit standard provides that "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir.2003) (internal quotations and citation omitted). "This is something more than a mere scintilla but something less than the weight of the evidence." *Foust v. Lujan,* 942 F.2d 712, 714 (10th Cir.1991). "Evidence is generally substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a verdict on a factual conclusion." *Hoyl v. Babbitt,* 129 F.3d 1377, 1383 (10th Cir.1997).

In this case, the Court cannot say that there is less than a scintilla of evidence supporting the agency's decision. In fact, there is ample evidence in the record indicating that commercial guides ameliorate the environmental impacts of snowmobiles in the Parks. As noted previously, the institution of the one hundred percent (100%) commercial guiding requirement cut the number of law enforcement cases reported in the Park in half. A.R. 95959. It also reduced the number of arrests from twenty-one (21) to two (2). *Id.* The guid-

ing requirement also reduced the number of animals deaths caused by snowmobiles from seven (7) to zero (0). A.R. 105881. In addition, the guiding requirement reduced the percentage of time that snowmobiles are audible as it keeps the machines grouped together and concentrates the sound into a smaller time period. *See* A.R. 96007, 96964, 99711.

Furthermore, the mere fact that there is evidence in the record contradicting the NPS's final conclusion does not prevent it from being supported by substantial evidence. *See Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Wyoming Farm Bureau Federation v. Babbitt,* 199 F.3d 1224, 1241 (10th Cir. 2000)("[T]he mere presence of contradictory evidence does not invalidate the Agencies' actions or decisions."). A reviewing court "cannot displace the [agency's] choice between two conflicting views, even if [it] would have made a different choice had the matter been before [it] de novo." *Custer County Action Ass'n,* 256 F.3d at 1036.

Therefore, the Court finds that the NPS's conclusion that all snowmobiles must be accompanied by commercial guides is supported by substantial evidence.

### B. Is the NPS's conclusion that commercial guides lead to responsible wildlife viewing and a lessening of impacts to the natural soundscapes supported by a reasoned analysis? ,

▇▇▇ Plaintiffs next claim that the NPS's conclusion that commercial guides lead to responsible wildlife viewing and a lessening of impacts to the natural sounds-

capes is not supported by a reasoned analysis. Plaintiffs claim that the commercial guiding requirement is a dramatic change in policy by the NPS and, therefore, the NPS is obligated to supply a reasoned analysis for such change. *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.").

As stated by the Federal Defendants, Plaintiffs' argument "plainly ignores history." *See* Defendants' Response to Plaintiff's and Plaintiff–Intervenor's Joint Opening Brief at 42. The NPS has been attempting to reduce snowmobile use, especially unguided use, in the Park since the issuance of the 2000 ROD. A.R. 91407–48. This trend has continued since that time. For example, the 2003 ROD found that guiding would lessen the environmental impacts caused by snowmobiles. A.R. 91654. Similarly, the 2003 Rule required eighty percent (80%) of all snowmobiles to be commercially guided. 68 Fed.Reg. 69,-268 (December 11, 2003). Thus, the 2004 Temporary Rule only differs from the 2003 Rule in one way: it does not allow twenty percent (20%) of the visitors to enter with a noncommercial guide or with no guide at all. *See* 69 Fed.Reg. 65,348 (November 10, 2004); 68 Fed.Reg. 69,268 (December 11, 2003). The Court cannot say that this change constitutes a major change in direction for the NPS.

However, even if the NPS did change its previous policy in the 2004 Temporary Rule, the NPS has provided valid reasons for its decision to require all visitors to travel with commercial guides. The NPS explained that due to "the timing of this FONSI and the commencement of the 2004–2005 winter season, it would be impossible to develop an adequate non-commercial guide training program for the upcoming winter season. In addition, it would be expensive and inappropriate during the winters of 2005–2006 and 2006–2007 due to the temporary nature of this plan." A.R. 99732. In regards to unguided access, the NPS noted that there were implementation problems with the non-commercial reservation system. A.R. 99732. The NPS found that local entities were buying large blocks of the reservations, most likely to be resold at a later date. *Id.* The NPS felt that this situation was unacceptable. *Id.* The NPS also stated that "unguided or non-commercially guided access to the parks would be addressed in a long-term winter use plan." *Id.* All of these statements explain why the NPS decided to require one hundred percent (100%) commercial guiding under the 2004 Temporary Rule.

Based upon the foregoing, the Court finds that the NPS was not required to supply a reasoned analysis for the guiding requirement as it was not a drastic change in policy. However, even if it were, the Court further finds that the NPS's conclusion that commercial guides lead to responsible wildlife viewing and a lessening of impacts to the natural soundscapes is supported by a reasoned analysis. Nevertheless, had the Court been given the chance to decide this issue instead of the NPS, it would have selected the alternative of twenty percent (20%) unguided snowmobiles; but, as already noted, the Court is obligated to decide this matter within the parameters of the decided cases, not its own preferences.

**C. Is the NPS's decision that more than 720 snowmobiles would cause significant adverse effects on the environment supported by substantial evidence?**

Under this claim, WLRA and Wyoming contend that the NPS's decision

that more than 720 snowmobiles would cause significant adverse effects on the environment is not supported by substantial evidence. More specifically, Plaintiffs argue that the NPS's decision to reject Alternative 5 cannot be supported by the record. The Court disagrees for the reasons stated below.

As mentioned previously, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Doyal,* 331 F.3d at 760 (internal quotation omitted). Substantial evidence requires "something more than a mere scintilla but something less than the weight of the evidence." *Foust,* 942 F.2d at 714. In other words, "[e]vidence is generally substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a verdict on a factual conclusion." *Hoyl,* 129 F.3d at 1383.

In the current case, the record is replete with evidence supporting the decision to limit daily snowmobile entries to 720 and to reject the 950 snowmobile limit. By way of example, the 2004 EA explicitly states that "950 snowmobiles per day would pose major adverse impacts upon park soundscapes, increased risks to park employee health and safety, and would also impact the visitor experience in the park." A.R. 99735–36. There is also evidence which shows that 720 snowmobiles per day have an audibility level of ninety-three percent (93%) at Old Faithful, well above the seventy-five percent (75%) maximum allowed for a FONSI. *See* A.R. 96012. Similarly, the record tends to show that an increase in snowmobile numbers will have a greater impact on the natural soundscapes. *See, e.g.,* A.R. 96016–17, 105429. This evidence more than satisfies the substantial evidence standard required by the APA.

Additionally, the fact that the record may contain evidence which supports a 950 snowmobile limit does not render the Agency's decision invalid. *Consolo,* 383 U.S. at 620, 86 S.Ct. 1018; *Wyoming Farm Bureau Federation,* 199 F.3d at 1241. The NPS is allowed to choose between conflicting evidence in making its decision. *Custer County Action Ass'n,* 256 F.3d at 1036. We all must keep in mind that the NPS is the expert in this area and, consequently, is entitled to a great amount of deference when making such decisions. *See Organized Fishermen of Florida v. Hodel,* 775 F.2d 1544, 1550 (11th Cir.1985) ("[T]he Secretary [of the Interior] has broad discretion in determining how best to protect public land resources."); *Southern Utah Wilderness Alliance v. National Park Service,* 387 F.Supp.2d 1178, 1189 (D.Utah 2005) (noting that the NPS has expertise in managing national parks); *Miccosukee Tribe of Indians of Florida v. United States,* 980 F.Supp. 448, 462 (S.D.Fla.1997) ("[T]he Interior Department has broad discretion in determining how best to protect public lands, weigh competing uses of federal property, and allocate park resources."); *Conservation Law Foundation of New England, Inc. v. Clark,* 590 F.Supp. 1467, 1476 (D.Mass.1984) (noting that "the National Park Service ... [has] significant expertise in environmental matters").

Therefore, the Court finds that the NPS's decision that more than 720 snowmobiles would cause significant adverse effects on the environment is supported by substantial evidence.

**D. Is the NPS's decision that more than 720 snowmobiles would cause significant adverse effects on the environment supported by a reasoned analysis?**

In their final claim, Plaintiffs argue that NPS's decision that more than

720 snowmobiles would cause significant adverse effects on the environment is not supported by a reasoned analysis. Plaintiffs contend that the NPS used different assumptions when analyzing Alternatives 4 and 5. Plaintiffs aver that under Alternative 4 the NPS assumed that fifty-one percent (51%) of the daily limit of 720 snowmobiles would enter the Park on non-peak days. However, according to Plaintiffs, the NPS did not use this assumption under Alternative 5. Rather, the NPS simply assumed that the total of snowmobiles entering the park would be much higher on non-peak days. The Federal Defendants respond that NPS did not utilize a fifty-one percent (51%) assumption. Rather, according to them, this test was "invented" by Plaintiffs.

The Court tends to agree with Defendants. At no place does the 2004 EA reference a fifty-one percent (51%) assumption in regards to non-peak days. In fact, the EA actually infers that the NPS assumes non-peak entries to be between forty-one (41%) and seventy-five percent (75%). *See* A.R. 96012 (noting that 300–540 snowmobiles would enter Yellowstone on non-peak days under Alternative 4). Furthermore, as argued by Defendants, applying a fifty-one percent (51%) assumption to Alternative 5 would defeat the purpose of that potential choice, *to wit*, to evaluate the effects of allowing more than 720 snowmobiles into the Parks on a daily basis.

Therefore, for the reasons just stated, the Court finds that the NPS's decision that more than 720 snowmobiles would cause significant adverse effects on the environment is supported by a reasoned analysis.

## CONCLUSION

This case, like those before it, illustrates that there may not be a solution which fully satisfies all parties involved in this litigation. As a result, this case is not likely to be the terminal, or even penultimate for that matter, suit pertaining to snowmobiles in the Parks. The Court can only hope that the long-term studies proposed by the NPS will yield results that are acceptable to all of the parties. However, in the interim, it is clear to this Court that the 2004 Temporary Rule, while not perfect in any sense, seems to be the best compromise currently available. The 2004 Temporary Rule will protect the natural resources of the Parks until the NPS determines the impact of the new and improved, best available technology snowmobiles.

However, the Court also clearly realizes that not all visitors to the Parks require guides and that most of these guests are very responsible in terms of protecting the Parks' resources. The Court hopes that the ultimate conclusion reached in the research of this issue allows many visitors to visit the Parks on an unguided basis. Yet, until the point when such research is complete, the aforementioned guests will have to abide by the commercial guiding requirements.

Therefore, based upon the foregoing discussion, the Court **FINDS** that: (1) the claims of WLRA and Wyoming are properly before this Court; (2) the NPS complied with NEPA in evaluating the commercial guide requirement; (3) the NPS did consider a reasonable range of alternatives; (4) the NPS adequately analyzed a "no action" alternative; (5) the NPS's conclusion that all snowmobiles must be accompanied by commercial guides is supported by substantial evidence; (6) the NPS's conclusion that commercial guides lead to responsible wildlife viewing and a lessening of impacts to the natural soundscapes is supported by a reasoned analysis; (7) the NPS's decision that more than 720

snowmobiles would cause significant adverse effects on the environment is supported by substantial evidence; (8) the NPS's decision that more than 720 snowmobiles would cause significant adverse effects on the environment is supported by a reasoned analysis; and (9) the 2004 FONSI, 2004 EA, and 2004 Temporary Rule were promulgated in accordance with the requirements of the APA and NEPA.

ACCORDINGLY, IT IS HEREBY ORDERED that the relief requested in Plaintiff's and Plaintiff–Intervenor's administrative appeal is DENIED.

HOWEVER, IT IS FURTHER ORDERED that this Court will retain jurisdiction over this matter during the pendency of the long-term environmental study to ensure that the NPS meets the requirements of NEPA and the APA during such process. More specifically, the Court will, should the need arise, carefully review the further actions of the NPS to ensure that the Agency adequately studies the impacts, or lack thereof, of unguided access to the Parks. Therefore, any claims or challenges regarding the long-term study and its resultant rules brought by the current parties shall proceed before this Court. The Court exercises this jurisdiction in an effort to promote judicial economy and effectiveness.